Nathan SCHULTZ and Duane Schultz, individually and trading as J.C. Schultz Company, a partnership,

v.

ONAN CORPORATION, Appellant.

No. 83–5539.

United States Court of Appeals, Third Circuit.

Argued April 2, 1984.

Decided June 15, 1984.

Reed Smith Shaw & McClay, Richard T. Wentley (argued), Craig W. Jones, Debra A. Mangus, Pittsburgh, Pa., Dorsey & Whitney, Peter Dorsey (argued), Minneapolis, Minn., for Onan Corporation.

McClure, Dart, Miller, Kelleher & White, Eugene J. Brew, Jr. (argued), R. Perrin Baker, Elizabeth A. Brew, Erie, Pa., for J.C. Schultz Company.

Before GIBBONS and SLOVITER, Circuit Judges, and BISSELL, District Judge.*

**OPINION OF THE COURT**

GIBBONS, Circuit Judge.

Onan Corp. appeals from a judgment against it in the amount of $72,500 with costs in favor of Nathan and Duane Schultz, trading as J.C. Schultz Co., a partnership (Schultz). That judgment, entered on a jury verdict after a second trial, followed a reversal and remand by this court in a prior appeal. *Schultz v. Onan Corp.*, 681 F.2d 177 (3d Cir.1982). We reluctantly conclude that a new trial on liability and damages is required.

I.

*A. The First Trial*

On August 1, 1975, Schultz acquired a distributorship previously operated by Joseph C. Schultz. The business distributed engine-driven electrical generators, manufactured by Onan Corp., in eleven counties in northwestern Pennsylvania. A series of written distributorship agreements, each for a three-year term, governed the relationship between Schultz and Onan. The last such agreement was executed on June 3, 1977 and specifies a termination date of December 31, 1980. By its terms, the agreement is to be "governed and construed in accordance with the laws of the State of Minnesota," where Onan has its principal place of business. The contract provides for earlier termination by either party "for any reason upon sixty (60) days written notice to the other," and by Onan "upon thirty (30) days written notice to [Schultz] in the event [that Schultz] shall have failed to fulfill any one or more of [its] responsibilities set forth in Article 9 of this Agreement." App. at 459. These provisions permitting termination are set forth in greater detail in Part III A *infra*.

By letter dated March 24, 1978, Onan notified Schultz that "[i]n accordance with previous communications with you, ... the distributorship relationship between Onan and J.C. Schultz Company is to be terminated sixty (60) days from the date of this letter." App. at 467. Thereafter Onan appointed A.F. Shane Co. as distributor for northwestern Pennsylvania.

---

* Hon. John W. Bissell, United States District Judge for the District of New Jersey, sitting by designation.

On June 25, 1979, Schultz filed a four-count complaint against Onan and A.F. Shane. Count I alleged violations of sections 1 and 2 of the Sherman Act and section 2(a) of the Clayton Act. Counts II, III, and IV sought damages on Minnesota state-law causes of action for equitable recoupment, conspiracy, and restitution of profits retained by the defendants. The complaint did *not* plead a cause of action under the Minnesota Franchise Act. Minn. Stat.Ann. §§ 80C.01 to 80C.22 (West Supp. 1983) (MFA). The section 2 Sherman Act and section 2(a) Clayton Act claims were voluntarily withdrawn before the first trial. At the end of the plaintiffs' case in that trial, the district court directed verdicts against Schultz on all remaining claims except Count II, which sought damages against Onan under Minnesota law for equitable recoupment.[1] No appeal was taken from the directed verdicts.

■ We examine the equitable recoupment claim at greater length below. For present purposes, the recoupment claim involves a Minnesota doctrine that an exclusive franchise dealer who has invested in distribution facilities may recoup his investment from the franchisor if the distributor is terminated "without just cause" before the franchisee has been afforded a reasonable opportunity to recoup that investment. *See Ag-Chem Equipment Co. v. Hahn, Inc.,* 480 F.2d 482, 486 (8th Cir.1973); *Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.,* 395 F.2d 388, 391 (8th Cir. 1968). In the first trial the jury returned a verdict on that claim for $45,500. Onan's motions for judgment notwithstanding the verdict and for a new trial were denied, and Onan appealed. This court, in turn, reversed the $45,500 judgment. We held that as a matter of Minnesota law, the equitable recoupment doctrine was not ap-plicable to contracts terminable only for "just cause." 681 F.2d at 179–80. Moreover, we reasoned, the MFA applied to the Schultz-Onan contract. As interpreted in the case of *Gilderhus v. Amoco Oil Co.,* 1980–81 Trade Cas. (CCH) ¶ 63,647 (D.Minn.1980), contracts governed by the MFA could be terminated prior to their expiration date only for just cause. 681 F.2d at 181. Hence, we concluded, Schultz "may not recover under [the] recoupment doctrine." *Id.* We then remanded for consideration of any possible recovery on a breach of contract theory. *Id.*

■ Unfortunately, the first reference to the MFA was made during oral argument on the prior appeal. Thus, no record had been made with respect to the elements of a claim under that Act. Under Minnesota law, the MFA is only applicable to franchises for which a "franchise fee" has been paid. Minn.Stat.Ann. § 80C.01 Subd. 4(a)(3) (West Supp. 1983); *RJM Sales & Marketing, Inc. v. Banfi Products Corp.,* 546 F.Supp. 1368, 1373 (D.Minn.1982). As we observe below, there is no evidence in the record that a franchise fee had been paid. Consequently, it seems clear that the precise ground relied upon for reversing the $45,500 judgment had no factual foundation. Nor did the panel address the main points briefed by Onan on the inapplicability of the recoupment doctrine or the propriety of the court's instructions on damages.[2]

## B. The Second Trial

On remand, the district court permitted Schultz to amend the complaint to assert, for the first time, a breach of contract claim asserting that the franchise agreement had been breached without just cause and sufficient notice. Schultz pleaded this contract claim in counts V through VIII of

---

1. Because there was diversity of citizenship between Onan and Schultz, the only remaining defendants, the district court properly proceeded with this state-law claim. 28 U.S.C. § 1332 (1982).

2. Onan maintained that recoupment is inapplicable to any franchise agreement of fixed duration with express provisions for termination; that Onan had not required Schultz's investment in the distributorship; that any investment had been recovered; that the court erred in failing to charge that the jury must find that the duration of the recovery period was reasonable; and that the court improperly charged the jury on damages. Appellant's Brief in No. 81–2105, at 17–25; *see* Part III *infra.*

the amended complaint. The contract theory was predicated upon the applicability of the MFA as interpreted in *Gilderhus* and our first appeal. Over Onan's objection, the case was presented to the jury with a binding instruction that the MFA applied. The jury returned a verdict of $72,500 for Schultz, and Onan again appealed. Onan now contends that the district court erred in charging the jury that the MFA applied, arguing that the record contains no evidence satisfying the elements of that Act. Onan relies on other trial errors as well which we need reach only if further proceedings are necessary on the amended complaint.

## II.

### A. Applicability of the Minnesota Franchise Act

■ The Schultz-Onan contract is a "franchise" within the meaning of the MFA if it is a contract:

(1) by which a franchisee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's trade name, trademark, service mark, logotype, advertising, or other commercial symbol or related characteristics;

(2) in which the franchisor and franchisee have a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise; and

(3) *for which the franchisee pays, directly or indirectly, a franchise fee;* ...

Minn.Stat.Ann. § 80C.01 Subd. 4(a) (West Supp. 1983) (emphasis added). We may assume arguendo that the record would support a finding in Schultz's favor on the first two elements. The provisions of the definition are, however, conjunctive. All three elements must be present for a franchise to exist. *RJM Sales & Marketing, Inc. v. Banfi Products Corp.*, 546 F.Supp. 1368, 1373 (D.Minn.1982); *Siedare Assocs. Inc. v. Amperex Sales Corp.*, [1980–83 Transfer Binder] Bus. Franchise Guide (CCH) ¶ 7732, at 12,861 (D.Minn.1981). Thus, unless a franchise fee has been paid the agreement does not fall within the Act. The MFA defines the term "franchise fee" as:

any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, *any payment for goods or services, or any training fees or training school fees or charges;* ....

Minn.Stat.Ann. § 80C.01 Subd. 9 (West Supp. 1983) (emphasis added).[3]

■ Pointing to the italicized language "any training fees or training school fees or charges," Schultz offers evidence in the trial record that Nathan and Duane Schultz attended courses or seminars at the Onan factory as proof of payment of a franchise

---

3. The MFA further provides that the following shall not be considered the payment of a franchise fee:

(a) The purchase of goods or agreement to purchase goods at a bona fide wholesale price;

(b) The purchase of goods or agreement to purchase goods on consignment, if the proceeds remitted by the franchisee from any such sale shall reflect only the bona fide wholesale price of such goods;

(c) The repayment by the franchisee of a bona fide loan made to the franchisee from the franchisor;

(d) The purchase of goods or agreement to purchase goods at a bona fide retail price subject to a bona fide commission or compensation plan that in substance reflects only a bona fide wholesale transaction;

(e) The purchase, at their fair market value, of supplies or fixtures or agreement to so purchase supplies or fixtures necessary to enter into the business or to continue the business under the franchise agreement;

(f) The purchase or lease, at the fair market value, of real property or agreement to so purchase or lease real property necessary to enter into the business or to continue the business under the franchise agreement.

Minn.Stat.Ann. § 80C.01, Subd. 9 (West Supp. 1983).

fee. There is no evidence, however, that any fees were paid or charges incurred to Onan for these courses or seminars. The expenditure of funds for travel, lodging, food, and other ordinary business expenses does not constitute a franchise fee. *RJM Sales & Marketing, Inc.*, 546 F.Supp. at 1373. Schultz also points to evidence that it paid Joseph C. Schultz $36,000 when it acquired his business in 1975. There is no support either in the language of the MFA or in any of the cases interpreting it, however, that payments to third parties qualify as franchise fees. Thus, on the record before us there is no evidence of a franchise covered by the Act. Schultz therefore failed to prove the MFA claim asserted in counts V through VIII of the amended complaint.

### B. Law of the Case

Schultz also urges that despite the absence of record evidence of a franchise covered by the MFA, our prior decision in *Schultz v. Onan Corp.*, 681 F.2d 177 (3d Cir.1982), is the law of the case on this question. We cannot agree. Of course, the law-of-the-case doctrine applies "to issues that were actually discussed by the court in the prior appeal [and] to issues decided by necessary implication." *Todd & Co., Inc. v. SEC*, 637 F.2d 154, 157 (3d Cir.1980). This court did not, however, address the sufficiency of the evidence to sustain an application of the MFA to the Schultz-Onan agreement. Our decision is therefore not the law of the case on this question.[4]

Moreover, even if we were to agree that this issue had been previously decided, we could not conclude that the law-of-the-case doctrine controls. Recently we summarized several commonly recognized exceptions to the doctrine:

> [T]his court has recently held that a successor judge may entertain a timely motion to reconsider the conclusions of an unavailable predecessor, because otherwise the right to move for reconsideration would be effectively denied.... Another exception exists if new evidence is available to the second judge when hearing the issue. In this situation, "the question has not really been decided earlier and is posed for the first time; the second judge ought, therefore, to be free to render a decision." ...
>
> A third exception to the law of the case doctrine is that every court "had a duty to apply a supervening rule of law despite its prior decisions to the contrary when the new legal rule is valid and applicable to the issues of the case."

*Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169–70 (3d Cir.1982) (citations and footnotes omitted). In addition, although in *Hayman* we declined to address a fourth exception applicable if "the decision was clearly erroneous and would work a manifest injustice," *id.* at 170 n. 10, the Supreme Court in a subsequent opinion has approved this exception as well. *Arizona v. California*, 460 U.S. 605, 103 S.Ct. 1382, 1391 n. 8, 75 L.Ed.2d 318 (1983). And we bear in mind, as the Supreme Court has noted, that "[l]aw of the case directs a court's discretion, it does not limit the tribunal's power." *Arizona*, 103 S.Ct. at 1391; *see Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912); *Hayman*, 669 F.2d at 169. The doctrine is not a "barrier to correction of judicial error." *Loumar, Inc. v. Smith*, 698 F.2d 759, 762 (5th Cir.1983).

---

**4.** In any event we could not agree that the district court was obliged to charge that the MFA must apply. Our prior opinion states that "[w]e express no view ... on the question of whether plaintiffs are now entitled to assert any alternative breach of contract theory of recovery, or on whether the plaintiffs have waived any such claim." 681 F.2d at 181. Thus the panel opinion appears to have left open for the district court's consideration whether an amendment to the complaint should have been permitted, and the defenses, if any, which may have been asserted if an amendment were to be authorized. At no point until the district court authorized an amended complaint did Onan have an opportunity to respond to the contention that the MFA modified the written contract so as to make it a contract terminable only for cause.

■ We need not decide whether the "manifest injustice" exception is applicable here. The law-of-the-case doctrine does not compel our application of the MFA in this case because evidence of the absence of a franchise fee is now available. Consequently, "the question has not really been decided earlier and is posed for the first time." *Hayman*, 669 F.2d at 169. Thus, the judgment of the district court on Schultz's amended complaint, which is predicated on the applicability of the MFA, must be reversed.[5]

We must therefore consider an appropriate disposition for this appeal. Onan contends that if, as we have held, the second judgment must be reversed, we must direct judgment for Onan because it was entitled to judgment as a matter of law on the first appeal. For the reasons addressed below, however, we believe that Onan was not entitled to such a judgment on the first appeal.

### III.

*A New Trial on Count II is Required*

Onan pressed four issues on the first appeal. The district court erred, Onan maintained, (a) in holding that the Minnesota doctrine of recoupment was applicable; (b) in permitting recovery without a showing that Onan encouraged or required plaintiffs to invest in the distributorship; (c) in instructing the jury improperly on damages; and (d) in failing to instruct the jury that Schultz enjoyed a reasonable time to recoup its investment and minimize any loss.

### A. Applicability of The Recoupment Doctrine

Onan urged that the doctrine of equitable recoupment did not apply to the Schultz distributorship because the franchise agreement was for a definite duration.

This claim requires that we review the Minnesota recoupment doctrine and the terms of the Schultz-Onan agreement.

■ The Minnesota recoupment doctrine is explicated in four recent opinions on which the parties rely. *Ag-Chem Equipment Co. v. Hahn, Inc.*, 480 F.2d 482 (8th Cir.1973); *McGinnis Piano & Organ Co. v. Yamaha Int'l Corp.*, 480 F.2d 474 (8th Cir.1973); *Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.*, 395 F.2d 388 (8th Cir.1968); *Gilderhus v. Amoco Oil Co.*, 1980–81 Trade cas. (CCH) ¶ 63,647 (D.Minn.1980). *Ag-Chem, McGinnis,* and *Clausen* involved oral franchise agreements with no termination date specified. Under Minnesota law,

> franchise agreements which do not contain provisions for duration or termination are ordinarily terminable by either party at will upon reasonable notice to the other [party].

> [In addition,] Minnesota law [permits] a reasonable duration to be implied in franchise agreements where a dealer has made substantial investments in reliance on the agreement. Reasonableness in such situations is measured by the length of time reasonably necessary for a dealer to recoup its investment. A reasonable notice period prior to termination is also required.

*McGinnis*, 480 F.2d at 479. Thus, under Minnesota law a substantial investment made in reliance on a franchise agreement specifying no duration gives rise to an implied contract for a duration equal to "the length of time reasonably necessary for [the franchisee] to recoup its investment" plus reasonable termination notice.

■ The doctrine of equitable recoupment applies when such a contract is terminated without just cause before the franchisee has recouped its investment. The doctrine is stated succinctly in *Clausen:*

---

5. Our Internal Operating Procedures provide that "reported panel opinions are binding on subsequent panels." Third Cir.Int.Op.Proc. ch. 8(C). A similar analysis governs our application of IOP ch. 8(C). First, as we held above, our earlier decision did not discuss the factual predicate for the MFA and thus is not precedential with respect to that question. Second, IOP ch. 8(C) must be construed in harmony with the law-of-the-case doctrine, which is also Circuit precedent.

[U]nder Minnesota law where an exclusive franchise dealer under an implied contract, terminable on notice, has at the instance of a manufacturer or supplier invested his resources and credit in establishment of a costly distribution facility for the supplier's product, and the supplier thereafter unreasonably terminates the contract and dealership without giving the dealer an opportunity to recoup his investment, a claim may be stated [in recoupment].

395 F.2d at 391.

■ Onan urged that the recoupment doctrine applies *only* to contracts without specified duration, for which a reasonable duration is imputed by law. This interpretation is not, however, supported by the cases. In *Ag-Chem,* the court held that "[a] review of the authorities on recoupment makes it clear that a threshold requirement to the right *is the existence of an agreement which is terminable at will.*" 480 F.2d at 487 (emphasis added). It is the "at-will" nature of the agreement—leaving the franchisee unprotected in the event of a sudden termination without just cause—that gives rise to the recoupment doctrine. Whether the "at-will" term was express or implied was of no moment to the decisions in *Clausen, Ag-Chem,* and *McGinnis,* and is irrelevant to the policy of equitable recoupment.

This conclusion is reinforced by the recent decision in *Gilderhus,* in which a written contract was to terminate in 1982, or "forthwith" in the event that a specified breach was not cured within five days of notification. The district court reasoned that the contract was terminable "forthwith" only upon just cause—the failure to cure a breach within a reasonable time—and was therefore not an agreement "at will." Consequently the recoupment doctrine did not apply. The court necessarily rejected Onan's position that the recoupment doctrine did not apply simply because the contract specified a duration date of 1982. Rather, the crucial question was whether the agreement was terminable at will.

■ The Schultz-Onan agreement was to terminate on December 31, 1980, unless any of three events caused an earlier termination:

1. Either party may terminate this Agreement *for any reason* upon sixty (60) days written notice to the other.

2. Onan may terminate this Agreement upon thirty (30) days notice to Distributor in the event Distributor shall have failed to fulfill any one or more of Distributor's responsibilities set forth in Article 9 of this Agreement [governing duties of the distributor].

3. Onan may terminate this Agreement by written notice given to Distributor, effective immediately, in any of the following events [referring to change of ownership or insolvency].

App. at 459 (emphasis added).

Two of these paragraphs permit terminations for just cause, and are analogous to the *Gilderhus* provision permitting termination upon an uncured breach. The first paragraph, however—permitting termination "for any reason" at any time upon sixty days notice—renders the agreement an at-will contract within the meaning of the recoupment doctrine. The contract plainly could have been terminated without just cause immediately after the making of a substantial investment. That is precisely the eventuality to which the recoupment doctrine is addressed. Thus we must reject Onan's position that the recoupment doctrine is inapplicable.

### B. Did Onan Encourage or Require Investments

■ Onan maintained that it did not "encourage or require" the plaintiff's investment in the distributorship. This argument rested on Onan's position that the relevant "investment" was made by Nathan and Duane Schultz when in 1975 they purchased the distributorship for $36,000 from Joseph C. Schultz, their father. Onan observed that it in no sense encouraged or

required the Schultz brothers to make this investment.

This argument, however, misstated the relevant investment. The change of ownership from father to sons was irrelevant to Schultz's theory. Rather, *Ag-Chem* requires that we determine whether "the distributorship required a continual investment." 480 F.2d at 488. Article 9 of the Schultz-Onan agreement specifies at great length the continuing investment obligations imposed on the distributor. App. at 457–59. Indeed, these were the obligations of which Onan had alleged the Schultz brothers were in breach. Onan attached no significance to Schultz's change of ownership and continued to require the investments specified under Article 9. Consequently, we cannot conclude as a matter of law that Onan did not require or encourage Schultz's investment.

### C. Recoupment of Profits and Future Profits

The jury awarded Schultz damages of $45,500, equal to the value of the distributorship at the time of its termination. Onan urged that the district court erred in instructing the jury on damages (1) by permitting the jury to assess damages equal to the value of the business without subtracting benefits derived from the business, and (2) by awarding both future profits and unrecouped investment.

Under the Minnesota recoupment doctrine, the distributor is

entitled to damages in the amount of its unrecouped expenditures, *taking into account, of course, the value of any benefits it may have derived from the arrangement during its existence or may derive thereafter.*

*Ag-Chem*, 480 F.2d at 489 (emphasis added). "[U]nrecouped expenditures" refers to the initial or continuing investment required of the franchisee, reduced to the extent that profits were earned by the distributorship as a fruit of the investment. *Id.* In particular, "unrecouped expenditures" includes any unamortized capital expenditures that would have produced fu-

ture profits (or reduced future costs) had the distributorship continued in existence. For example, if equipment with a depreciable life of 20 years is purchased one day before a wrongful termination, the unamortized portion of the equipment is an unrecouped expenditure. *Ag-Chem*, 480 F.2d at 488–89. The plaintiff is not permitted to recover damages for loss of future profits. *McGinnis*, 480 F.2d at 481. Recovery for future profits is prohibited because recoupment is an equitable doctrine intended to restore the franchisee's lost investment, not to award damages at law for the going value of the business.

Special attention must be paid, when awarding damages, to the nature of the violation alleged. As noted earlier, the recoupment doctrine imputes into the contract a duration equal to "the length of time reasonably necessary for a dealer to recoup its investment" plus a "reasonable notice period prior to termination." *McGinnis*, 480 F.2d at 479. The reasonableness of the notice period is "defined as that period of time necessary to close out the dealership." *Id.* at 480. In this case, Schultz did not allege that a reasonable time had not elapsed for the recovery of its initial investment, undoubtedly because the distributorship had been an ongoing one since 1961. Rather, Schultz alleged that the notice period of 60 days was unreasonably short, affording insufficient time to recoup any investment made during the period preceding the notice. Thus, damages should have been limited to the value of unamortized capital expenditures at the time of termination—here 60 days after March 24, 1978—plus any investments made pursuant to Article 9 of the Agreement from which offsetting profits were not earned, because of the brief notice period, either during the distributorship's existence or thereafter.

Evidence at trial revealed that Schultz had net earnings of $16,628 in 1976, $26,774 in 1977, and $9,820 in 1978. App. at 480–81, 488–89, 517. In addition, some evidence at trial indicated that Schultz continued to ship parts "significantly beyond the

sixty day[ ] [period]." 1981 App. at 379. Thus, there was substantial evidence that Schultz had earnings that may have offset investments made pursuant to Article 9 of the Agreement.

■ Onan requested instructions that would have required that the jury subtract profits earned as the fruit of investments "required or encouraged by Onan" from the value of such investments.[6] The district court declined to give these instructions, charging instead as follows:

> [I]f the jury finds that there wasn't time enough for them to orderly wind up the business and if they've lost or suffered damage on that account—and we'll discuss that a little further—they may have a recovery....
>
> [I]f you find that Onan unreasonably terminated the contract and distributorship of the Schultz's, without giving them an opportunity to recoup their investments, you may find in favor of the Schultz's—and if you find in favor of the Schultz's that is done damage-wise, the amount of money that you should award to them is what you determine to be their unrecouped investment in the business. *You have evidence before you to determine this figure—and that, of course, is the fair market value of the business at the end of 1977, as being forty-five thousand, five hundred dollars—and as I'll mention to you in a few minutes, that's oral testimony, and you may accept it or reject it—and you shouldn't reject it, unless it's unreasonable.*

1981 App. at 30, 32 (emphasis added). Thus, the district court charged that the jury may find the value of any unrecouped investment as "the fair market value of the business at the end of 1977." The court did not direct the jury to subtract from this figure any income earned as a result of investments required by Onan.

This instruction was erroneous for two reasons. First, the fair market value of the business in 1977 is not equivalent to the value of investments made at the behest of Onan during the period preceding the termination. A significant portion of the 1977 market value, for example, consists of capital expenditures long since recovered in profits. In effect, the district court erroneously permitted an award of damages for the going value of the business. Second, the court did not direct that income earned as a fruit of investments made at Onan's behest be subtracted in order to determine "unrecouped investment." Thus, the jury did not consider whether income earned by Schultz in 1976 through 1978 offset investments required by Onan.

■ In a related argument, Onan urged that the district court erroneously permitted an award of lost future profits. We agree. The going value of the business was computed by considering the present value of projected income streams. 1981 App. at 212. This was an error of law. Recoupment is an equitable doctrine intended to restore lost investment to the franchisee, not to award damages at law for the present value of the business. These errors were certainly not harmless. The jury returned a verdict for $45,500, precisely in accord with the court's instructions. Thus a new trial on damages, at least, is necessary.

---

6. The requested charges were as follows:

11. In the event that you find that Plaintiffs have established by a preponderance of the evidence the existence of each of these elements required under the doctrine of recoupment, you may award damages to Plaintiffs in the amount of the investment they made in their business as required or encouraged by Onan, but from this amount, you must subtract all distributions and withdrawals as shown on the tax returns of Schultz subsequent to the time of the investment and you must also subtract the salvage value of the vehicles, equipment and other assets left with Schultz following their termination....

12. In the event that you find that Plaintiffs have established by a preponderance of the evidence the existence of each of these elements required under the recoupment doctrine, but in calculating the amount of the unrecouped investment you find that Plaintiffs during the course of their business and following its termination recouped or took more from their business than they invested, then your verdict must be for Onan. 1981 App. at 26–27.

### D. Reasonable Time

 Finally, Onan maintained that the district court erred by failing to instruct that the 60 day notice period was reasonable as a matter of law, and to direct a verdict in its favor. This argument is without merit. The reasonableness of any recoupment period is a question of fact for the jury. *Ag-Chem,* 480 F.2d at 488. Moreover, there was evidence in the record from which the jury might have inferred that the 60 day period was unreasonable. Joseph Schultz, for example, testified that a reasonable period "should be 6 months to a year." 1981 App. at 81. And the jury heard testimony that Onan in fact granted more than 60 days, 1981 App. at 379, from which it might have inferred that 60 days was unreasonable. Thus Onan was not entitled to a directed verdict on liability, and is not entitled to judgment notwithstanding the verdict on liability.

The question whether there should be a new trial on liability is a close one; when the basis of liability is equitable recoupment, the length of time required for recovery of the relevant investment is necessarily related to the amount thereof. In Part III C above we hold that the court's instructions on the elements of investment recoverable under the Minnesota recoupment doctrine were erroneous. We cannot hold that the jury's verdict on liability was untainted by that erroneous instruction. *See Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931); *Stanton by Brooks v. Astra Pharmaceutical Products,* 718 F.2d 553, 576 (3d Cir.1983); *Vizzini v. Ford Motor Co.,* 569 F.2d 754, 759–60 (3d Cir.1977). Thus, we hold that a new trial on Count II on both liability and damages must be granted.

### IV.

#### Conclusion

The judgment of this court in appeal No. 81–2105 shall be vacated, and a new judgment shall be entered remanding Count II for a new trial. The judgment appealed from in No. 83–5539 shall be vacated.

Costs in No. 83–5539 shall be taxed in favor of appellant.