### UNITED SERVICES AUTOMOBILE ASSOCIATION, et al., Plaintiffs,

v.

### Constance FOSTER, Defendant.

### Civ. No. 84–1596.

United States District Court, M.D. Pennsylvania.

Dec. 23, 1987.

Michael L. Browne, Christopher K. Walters, Reed, Smith, Shaw & McClay, Philadelphia, Pa., Robert B. Hoffman, Reed, Smith, Shaw & McClay, Harrisburg, Pa., for plaintiffs.

Andrew S. Gordon, Ellis M. Saull, Dist. Attys. Gen., Allen C. Warshaw, Sr. Deputy Atty. Gen., Office of Atty. Gen., Harrisburg, Pa., for defendant.

Karen Balaban, William Balaban, Harrisburg, Pa., for intervenors.

## MEMORANDUM

HERMAN, District Judge.

In this action against the Insurance Commissioner of the Commonwealth of Penn-

sylvania (hereinafter "Commissioner"), the plaintiffs, United Services Automobile Association, U.S.A.A. Casualty Insurance Company, U.S.A.A. Life Insurance Company, and U.S.A.A. Annuity and Life Insurance Company (hereinafter "USAA") challenge the constitutionality of Section 641 of Pennsylvania's Insurance Department Act of 1921, 40 Pa.C.S.A. § 281.[1] Presently before us are three motions: the motion of the Commissioner for summary judgment on abstention grounds; the motion of USAA for summary judgment on pre-emption grounds; and the motion of USAA for summary judgment on Commerce Clause grounds.

## I. BACKGROUND

USAA, a reciprocal interinsurance exchange organized and existing under the laws of Texas with its principal place of business in San Antonio, is licensed to sell insurance in Pennsylvania. In April, 1984, USAA Financial Services, a wholly-owned subsidiary of USAA, filed an application with the Federal Home Loan Bank Board for a Federal Savings Bank Charter for the USAA Federal Savings Bank: The bank received its charter and began operations in San Antonio in December, 1983. The bank has no locations in Pennsylvania.

In July and August, 1984, the Pennsylvania Insurance Department notified USAA that its indirect ownership of the bank in Texas constituted a violation of Section 641 of the Insurance Department Act and advised USAA that it must divest itself of the bank or risk revocation of its licenses to transact insurance business in Pennsylvania. In November, 1984, USAA brought the present action under 42 U.S.C. § 1983, seeking declaratory and injunctive relief against the Commissioner, and, in December, 1984, the Commissioner initiated state agency proceedings to revoke the plaintiffs' insurance licenses.

After consideration of the motion of the Commissioner to dismiss the federal action on abstention grounds, we ordered the action dismissed on September 30, 1985. USAA appealed from our order.

In June, 1986, the Court of Appeals for the Third Circuit reversed the judgment and remanded the case for further proceedings consistent with its opinion. *See United Services Automobile Association v. Muir*, 792 F.2d 356 (3d Cir.1986). Thereafter, we issued a preliminary injunction which prohibits the Commissioner from revoking the plaintiffs' insurance licenses pending further order.

In October, 1986, the Commissioner filed a Petition for a Writ of Certiorari in the Supreme Court. The Supreme Court denied the petition.

On August 21, 1987, we granted the motion of the Pennsylvania Association of Independent Insurance Agents, John M. Ulrich, Jr., Professional Insurance Agents Association of Pennsylvania, Maryland and Delaware, Inc., Charles P. Leach, Jr., Pennsylvania Association of Life Underwriters and Harold E. Alexander, to intervene in the action. Oral argument on the motions for summary judgment was held September 16, 1987.

## II. ABSTENTION

In our September, 1986, ruling in this case, we dismissed USAA's complaint on abstention grounds. We relied on the three different types of abstention set forth in *Railroad Commission of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); and *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The Court of Appeals for the Third Circuit reversed our ruling and held that none of

---

1.  Section 641, in pertinent part, provides:
    (b) No lending institution, public utility, bank holding company, savings and loan holding company or any subsidiary or affiliate of the foregoing, or officer or employe thereof, may, directly or indirectly, be licensed or admitted as an insurer or be licensed to sell insurance in this State either as a broker or as an agent

except that a lending institution or bank holding company, subsidiary or affiliate of a lending institution may be licensed to sell credit life, health and accident insurance and to sell and underwrite title insurance in accordance with regulations promulgated by the Insurance Commissioner.

the three types of abstention applied. *USAA v. Muir*, 792 F.2d 356. On remand, the Insurance Commissioner has again moved for abstention based solely on the *Younger* abstention. For the following reasons, we shall deny the motion.

The Commissioner has renewed the motion for summary judgment on abstention grounds basing his argument on the holding in the recent Supreme Court case of *Ohio Civil Rights Commission v. Dayton Christian Schools*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). In *Dayton*, the Supreme Court held that *Younger* abstention applies "to state administrative proceedings in which important state interests are vindicated, so long as in the course of those proceedings the federal plaintiff would have a full and fair opportunity to litigate his constitutional claim." *Id.* at 627, 106 S.Ct. at 2723, 91 L.Ed.2d at 522. The Court further ruled that even if the state administrative agency could not itself consider the constitutionality of a state statute it is called upon to enforce, "it would seem an unusual doctrine ... to say that [the agency] could not construe its own statutory mandate in the light of federal constitutional principles.... In any event, it is sufficient ... that constitutional claims may be raised in state court judicial review of the administrative proceeding." *Id.* at 629, 106 S.Ct. at 2724, 91 L.Ed.2d at 523.

**2.** The court in *Sullivan* stated:

Since *Younger*, the Court has recognized that extraordinary circumstances may threaten irreparable injury which justifies federal intervention in ongoing state proceedings even in the absence of bad faith or harassment by state officials. Although the Court has acknowledged that the nature of the term 'irreparable harm' makes it difficult to define every situation the term encompasses, the Court has stated that circumstances are extraordinary in the relevant *Younger* sense where they create 'an extraordinarily pressing need for immediate federal equitable relief,' and do not simply present a unique or unusual factual situation. Such need for relief appears justified upon a showing ' "that an injunction is necessary in order to afford adequate protection of constitutional rights." ' *Sullivan*, 811 F.2d at 179 (citations omitted).

**3.** The Third Circuit held:

Weighing the legal issues and the devastating economic consequences a license revoca-

■ Although we agree with the Commissioner that the holding of the Supreme Court in *Dayton* appears to overrule the Third Circuit's holding in *USAA v. Muir* on the issue of *Younger* abstention, the Third Circuit's latest decision involving *Younger* abstention, *Sullivan v. City of Pittsburgh*, 811 F.2d 171 (3d Cir.1987), requires us to reject the Commissioner's motion for summary judgment. In addition to the requirement under the *Younger* abstention doctrine that there be an ongoing state proceeding in which constitutional claims can be raised, the Third Circuit in *Sullivan* added the requirement that, in order to invoke *Younger* abstention, irreparable injury may not be threatened.[2]

■ In *USAA v. Muir*, the Third Circuit decided that USAA would suffer irreparable harm if we were to abstain.[3] Therefore, on the issue of abstention, we are bound by the Third Circuit's prior opinion in this case. If the Third Circuit in *Sullivan* had not added the requirement of no threat of irreparable harm to the *Younger* abstention doctrine, we would have leaned toward granting the Commissioner's renewed motion for summary judgment on abstention grounds. However, because of the *Sullivan* opinion, we are clearly bound by the Third Circuit's decision in *USAA v. Muir* under the law-of-the-case doctrine.[4]

tion would impose upon USAA on the one hand and the vague claim of risks to the state from a Texas bank not doing business in Pennsylvania on the other hand, we conclude that the district court erred by holding that the state appeal and supersedeas procedures adequately protected USAA's interests.
*USAA v. Muir*, 792 F.2d at 363.

**4.** The law-of-the-case doctrine applies to issues that were discussed by the court in a prior appeal. *Schultz v. Onan Corp.*, 737 F.2d 339, 345 (3d Cir.1984). Generally, a court will refuse to reopen what has already been decided. *Zichy v. City of Philadelphia*, 590 F.2d 503, 508 (3d Cir.1979). The court, however, has the duty to apply "a supervening rule of law despite its prior decisions to the contrary when the new legal rule is valid and applicable to the issues of the case." *Id.* Based on this duty to apply a supervening rule of law, we would have considered the defendant's renewed motion based on the Supreme Court's ruling in *Dayton* had the *Sullivan* decision not explained the Third

III. PRE–EMPTION

■ USAA has moved for summary judgment on pre-emption grounds, arguing that Section 641(b) as applied to USAA is invalid under the Supremacy Clause of the United States Constitution. Specifically, USAA claims that Section 641(b) is pre-empted by the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. § 1461 *et seq.*, the National Housing Act, 12 U.S.C. §§ 1730, 1730a, and the regulations promulgated pursuant to these acts. USAA offers two reasons to support its claim of pre-emption: (1) Congress has occupied the entire field regarding the organization, ownership, incorporation and operation of federal savings banks; and (2) Section 641 is in actual conflict with federal law, standing as an obstacle to the full accomplishment of the federal government's purposes in that the federal government, through the Federal Home Loan Bank Board and the Federal Savings and Loan Insurance Corporation, approved USAA's ownership of the savings bank in Texas.

Pre-emption of a state law by a federal law or regulation has its roots in the Supremacy Clause which provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof; ... shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. It is well-settled that pre-emption may occur in any of the following three ways:

First, in enacting the federal law, Congress may explicitly define the extent to which it intends to pre-empt state law. Second, even in the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is

Circuit's stance on the irreparable harm require-

impossible, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Michigan Canners and Freezers Assoc. v. Agricultural Marketing and Bargaining Board,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984) (*quoting Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)) (citations omitted).

USAA does not argue that Congress has explicitly defined its intent to pre-empt Section 641(b). Instead, USAA argues that pre-emption has occurred in either the second or the third way as set forth in the above-excerpted quote from *Michigan Canners.*

We shall first address USAA's argument that Section 641 is pre-empted because Congress has occupied the entire field of regulation pertaining to savings banks. The Supreme Court has explained that congressional intent to pre-empt may be inferred where the scheme of federal regulations is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation," *California Savings and Loan Association v. Guerra,* 479 U.S. 272, ____, 107 S.Ct. 683, 689, 93 L.Ed.2d 613, 623 (1987); or "where the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985).

In considering whether or not to infer pre-emption from the federal law's occupancy of the field or dominant federal interest, the Supreme Court has expressed the following cautionary note: "Undoubtedly, every subject that merits congressional legislation is, by definition, a subject of national concern. That cannot mean, however, that every federal statute ousts all related state law." *Id.* at 719, 105 S.Ct. at 2378. This cautionary note is in accord with other statements by the Supreme

ment.

Court to the effect that pre-emption analysis is to be "tempered by the conviction that the proper approach is to reconcile 'the operation of both statutory schemes with one another rather than holding one completely ousted,'" *Merrill Lynch v. Ware*, 414 U.S. 117, 127, 94 S.Ct. 383, 389–90, 38 L.Ed.2d 348 (1973); and "federal regulation of a field of commerce should not be deemed pre-emptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained." *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963).

Analyzing the case before us in light of these principles, we find that Section 641(b) is not pre-empted because of occupancy of the field by federal law.

It should first be noted that we do not dispute many of the arguments advanced by USAA. For example, we agree that the federal scheme under HOLA and the National Housing Act creates "a uniform and comprehensive federally regulated thrift system without state interference."[5] Furthermore, after carefully considering the Supreme Court's decision in *Fidelity Federal Savings and Loan Association v. de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), we recognize, as USAA points out, that "Congress invested the Board with broad authority to regulate federal savings and loans so as to effect the statute's purposes, and plainly indicated that the Board need not feel bound by existing state law." *Id.* at 162, 102 S.Ct. at 3027. In fact, the broad authority vested in the Board is clearly expressed in the federal regulations:

> The regulations in this Part 545 are promulgated pursuant to the plenary and exclusive authority of the Board to regulate all aspects of the operations of Federal associations, as set forth in section 5(a) of the Home Owners' Loan Act of 1933, 12 U.S.C. 1464, as amended. This exercise of the Board's authority is preemptive of any state law purporting

to address the subject of the operations of a Federal association.

12 C.F.R. § 545.2. Lastly, we do not dispute USAA's statement that the federal regulations governing federal savings banks are voluminous and comprehensive.

Despite our agreement with these arguments advanced by USAA, we cannot infer that federal law has left no room for a state law, such as Section 641(b), which concerns the state's insurance industry. While the federal regulations do occupy the entire field of regulation concerning the *operation* of federal savings banks, we cannot infer that these federal regulations also occupy the field of regulation concerning the relationship of these banks with other entities, such as insurance companies. The Supreme Court in *Fidelity Federal Savings and Loan* expressly suggested that Congress may *not* have occupied the entire field:

> As we noted above, a savings and loan's mortgage lending practices are a critical aspect of its "operation," over which the Board unquestionably has jurisdiction. Although the Board's power to promulgate regulations exempting federal savings and loans from the requirements of state law may not be boundless, in this case we need not explore the outer limits of the Board's discretion.

*Fidelity Federal Savings & Loan*, 458 U.S. at 167, 102 S.Ct. at 3029–30.

We find here that Section 641(b) does not address the *operations* of federal savings banks. In other words, it does not attempt to govern the operations of USAA's bank in Texas. Instead, Section 641(b) simply regulates the relationships between licensed insurers in Pennsylvania and other non-insurance entities. Hence, it is our opinion that the federal regulations governing the operations of federal savings banks and the state statute governing affiliations and ownership of insurance companies can coexist.

In a similar vein, USAA's argument that the sheer volume and comprehensiveness of the federal regulations governing feder-

---

5. Plaintiff's Brief Supporting Motion for Summary Judgment in Preemption Issue at 18.

al savings banks indicate the intent to occupy the entire field fails in light of the Supreme Court's statement in *Hillsborough County:*

> We are even more reluctant to infer pre-emption from the comprehensiveness of regulations than from the comprehensiveness of statutes. As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.

*Hillsborough County,* 471 U.S. at 717, 105 S.Ct. at 2377. In the instant case, the regulations are admittedly comprehensive; however, the Home Loan Bank Board has indicated an intent to pre-empt only those regulations governing the *operations* of federal savings banks.

■ USAA's alternative ground for arguing that Section 641(b) is pre-empted is that the state statute is in actual conflict with the federal law. An actual conflict between federal law and state law may pre-empt the state law to the extent it actually conflicts with the federal law. *California Savings and Loan Association,* 479 U.S. at ——, 107 S.Ct. at 689, 93 L.Ed. at 623. Such a conflict "occurs either because 'compliance with both federal and state regulations is a physical impossibility,' *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143 [83 S.Ct. 1210, 1217], ..., or because the state law stands 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.,* (*quoting Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). USAA argues that Section 641(b) stands as an obstacle to the federal government's purpose when it approved USAA's ownership of USAA's bank in Texas.

Determining whether state law frustrates congressional purpose is a two-step procedure. First, the court must engage in construction and interpretation of the state and federal statutes, and only then determine if a conflict exists. "[I]n deciding whether any conflict is present, a court's concern is necessarily with 'the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted.'" *Chicago and North Western Transportation Company v. Kalo Brick and Tile Co.,* 450 U.S. 311, 317–318, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981) (*quoting San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 243, 79 S.Ct. 773, 778, 3 L.Ed.2d 775 (1959)).

It is clear from the state statute that Pennsylvania is seeking only to regulate the *insurance* industry and not the banking industry. Section 641(b) deals exclusively with who may be licensed to sell insurance in this state. It says nothing about who may appropriately become a bank or savings and loan holding company. Admittedly, an insurance company that becomes affiliated with a savings and loan holding company will risk losing its insurance license in Pennsylvania, but that is because the state legislature has determined an affiliation between an insurance company and a saving and loan holding company would adversely affect the insurance industry. The statute does not regulate or protect any industry other than the insurance industry.

It is equally clear that the federal laws in question regulate only the savings and loan industry and not the licensing of insurance companies by states. Indeed, the House Report concerning the Savings and Loan Holding Company Amendments of 1967 explicitly states the purpose of that Act to be

> to provide a comprehensive statutory framework for the registration, examination and regulation of holding companies controlling one or more savings and loan associations, the accounts of which are insured by an agency of the Federal Government—the Federal Savings and Loan Insurance Corporation.

H.R.Rep. No. 997, 90th Cong., 2d sess., 1968 U.S.Code Cong. & Ad.News 1601, 1603. Nothing in the Act nor in the Feder-

al Home Loan Bank Board regulations even intimates that a purpose of the Act was to allow insurance companies to become savings and loan holding companies. Furthermore, nothing in either of the Acts guarantees a state license to sell insurance to an insurance company that becomes affiliated with a savings and loan. The federal and state acts are aimed at two completely separate purposes; they regulate two separate industries; and nothing in the federal act requires states to allow an affiliation between the two. Because there is no actual conflict between federal law and state law in the instant case, USAA has failed to demonstrate federal pre-emption of Section 641(b).

For the foregoing reasons, we shall deny USAA's motion for summary judgment on pre-emption grounds.

## IV. COMMERCE CLAUSE

USAA has also moved for summary judgment on Commerce Clause grounds. USAA argues that Section 641(b), when applied to USAA, places a severe burden on interstate commerce, a burden which is excessive in relation to the putative local benefits derived from Section 641(b). USAA further argues that Section 641(b) forces USAA either to cease transacting their insurance business with citizens of Pennsylvania or to surrender their federally-approved ownership of a federal bank in Texas.[6]

■ The Commerce Clause of the United States Constitution provides that "Congress shall have Power ... To regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has interpreted the Commerce Clause "not only as an authorization for congressional action, but, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." *Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979). Although a state has the power to regulate

matters of legitimate local concerns, it may not impede the free flow of commerce by "discriminating against the articles of commerce coming from outside the state," *Lewis v. B.T. Investment Managers, Inc.*, 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980), or by regulating matters of predominant national concern "which, because of the need for national uniformity, demand that their regulation, if any, be prescribed by a single authority." *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945). The Commerce Clause "also precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the state." *Edgar v. Mite Corp.*, 457 U.S. 624, 642–43, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982). Similar to the limitations placed on the jurisdiction of state courts, "any attempt 'directly' to assert extraterritorial jurisdiction ... would offend sister States and exceed the inherent limits of the State's power." *Id.* at 643, 102 S.Ct. at 2641, (*quoting Shaffer v. Heitner*, 433 U.S. 186, 197, 97 S.Ct. 2569, 2576, 53 L.Ed.2d 683 (1977)).

■ A state statute that regulates interstate commerce *indirectly* may also be precluded by the Commerce Clause. The appropriate test to apply to a regulation that indirectly regulates interstate commerce is the test enunciated by the Supreme Court in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970):

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit*, 362 U.S. 440, 443 [80 S.Ct. 813, 816, 4 L.Ed.2d 852 (1960)]. If a legitimate local purpose is found, then the question becomes one of

---

**6.** USAA does not argue that the Pennsylvania law discriminates against interstate commerce in favor of local business. Indeed, it could not make such an argument because Section 641(b) treats all insurance companies and all savings and loans alike, whether or not they are based in Pennsylvania.

degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* at 142, 90 S.Ct. at 847.

Because Section 641(b) regulates "evenhandedly to effectuate a legitimate local public interest," and because it affects commerce only incidentally, we have determined that the *Pike* test is the appropriate test to apply to the facts of the case at bar.

■ Thus, in accordance with the *Pike* test, we must uphold Section 641(b) unless the burden it imposes on interstate commerce is "clearly excessive in relation to the putative local benefits." We shall first examine the local benefits conferred by Section 641(b). The Commissioner and the intervenors suggest three primary local benefits: (1) to protect the insurance industry from, *inter alia*, unfair competition and economic concentration; (2) to protect consumers from coercive "tie-ins" and other forms of subtle pressure tactics by lending institutions; and (3) to protect the ability of the insurance examiners to monitor adequately the insurance industry. The Commissioner argues that these local benefits will be adversely affected if affiliations between insurance companies and lending institutions are permitted. It is our opinion, however, that in this case the adverse effects of affiliation are either not present where the affiliated bank is outside the jurisdiction, or are readily prevented in ways less burdensome than is prescribed in Section 641(b).

First, the Commissioner and intervenors express concern that without the protection of Section 641(b), the insurance industry faces the risk of unfair competition and economic concentration. However, testimony by Ronald Chronister, the former Acting Deputy Insurance Commissioner, indicates that concentration of economic power and decreased competition is not a concern with respect to USAA's affiliation with a Texas bank. *See* Notes of Testimony of Ronald Chronister, November 14, 1985, at 17–18. While we agree with the Commissioner that the consolidation of a large insurer and a large bank, such as Citibank, would produce significant economic clout,[7] here we are dealing with a small bank in Texas which at the present time has no locations in Pennsylvania.[8] Secondly, the Commissioner and the intervenors state that Section 641(b) protects the consumer particularly from subtle "tie-in" sales.[9] The risk of a "tie-in" sale, however, to a resident of Pennsylvania by a Texas bank is almost "nil." *Id.* at 11. Last, the Commissioner and the intervenors suggest that Section 641(b) protects the insurance examiner's ability to examine the solvency of affiliated insurance companies. While the prohibition of all affiliations between lending institutions and insurance companies provides an easier task for the insurance examiners in their examinations of insurance companies, we find that even in the absence of Section 641(b) the insurance examiners would still be able to examine the solvency of affiliated companies. Under the Federal Home Loan Bank Board regulations, the results of bank examinations by the Federal Home Loan Bank Board are available "to other agencies of the United States or a State for use where necessary in the performance of their official duties." 12 C.F.R. § 505.5(b).[10]

---

7. Notes of Testimony of Ronald Chronister, November 14, 1985, at 16–17.

8. It should be noted, however, that several Pennsylvania residents have credit cards issued by the Texas bank. While we have considered this fact, we find it but one small factor of the many factors we have weighed.

9. A "tie-in sale" occurs when a bank conditions the granting of credit upon the purchase of insurance from an affiliated agency or insurance company.

10. We acknowledge the unsworn declaration of Ronald Chronister filed September 10, 1987, that expresses the Insurance Department's difficulty in obtaining reports of examinations pursuant to 12 C.F.R. § 505.5. Regardless, the procedure is available to the Insurance Department and, therefore, it is not impossible for the Department to obtain reports of examinations prepared by the Federal Home Loan Bank Board.

Now we shall turn to the burdens imposed on commerce by Section 641(b). We find that Section 641(b)'s impact on commerce, when it is applied to USAA, is clearly excessive in relation to its putative local benefits. The Texas bank was properly approved by the appropriate federal agencies. It operates its business in accordance with the applicable federal regulations. It has no locations in Pennsylvania. And, specifically, it sells no insurance in Pennsylvania. USAA's insurance company has more than 40,000 policyholders in Pennsylvania. Its premium income in Pennsylvania exceeds $35 million per year. Furthermore, it services officers and members of the United States armed forces who frequently move about the nation.

If the Insurance Department enforces Section 641(b) against USAA, USAA will be forced to abandon its insurance business in Pennsylvania or relinquish its interest in the Texas bank. If USAA opts to allow its insurance license to be revoked, this revocation could result in devastating economic consequences.[11] On the other hand, if USAA were to relinquish its interest in the Texas bank, it would be giving up that which the federal government has authorized it to own. Although Section 641(b) does not require USAA to relinquish its interest in the Texas bank, Section 641(b) certainly has the practical effect of interfering with the business of the Texas bank. We agree with USAA that the choice facing USAA, if Section 641 is enforced against it, is, in practical effect, no choice at all.

The instant situation is much like that encountered by the Supreme Court in *Edgar v. Mite Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). There, in an effort to protect Illinois shareholders from hostile tender offers, the Illinois legislature passed a law regulating tender offers made to both in-state and out-of-state corporations. The Supreme Court observed that the "most obvious burden the Illinois Act imposes on interstate commerce arises from the statute's previously described nationwide reach which purports to give Illinois the power to determine whether a tender offer may proceed anywhere." *Id.* at 643, 102 S.Ct. at 2641. Weighing this burden against the legitimate local concerns of protecting resident security holders and regulating the internal affairs of companies incorporated under Illinois law, the Court held:

> We agree with the Court of Appeals that these asserted interests are insufficient to outweigh the burdens Illinois imposes on interstate commerce.

> While protecting local investors is plainly a legitimate state objective, the State has no legitimate interest in protecting nonresident shareholders. Insofar as the Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law.

*Id.* at 644, 102 S.Ct. at 2641. The same can be said of the instant Pennsylvania law. The burden imposed by Section 641(b) is clearly excessive in relation to the local benefits.

Furthermore, insofar as Section 641(b) is needed to regulate affiliations between insurance companies and lending institutions *within* Pennsylvania where the concerns of the Commissioner and the intervenors be-

---

**11.** The Third Circuit stated the following in *USAA v. Muir* in regard to the irreparable harm USAA would suffer if its insurance license were revoked:

> The threat of revocation might alarm an unknown number of USAA's more than 40,-000 Pennsylvania policyholders into cancelling their insurance. Nationwide, a revocation order even if stayed, would prevent USAA from continuing unqualifiedly to represent that its insurance contracts are available in all 50 states. Because USAA limits its policies primarily to commissioned officers of the United States armed forces, persons who move frequently in the service of their country, the inability to offer insurance coverage in every state may well be a major blow.
> Weighing the legal issues and the devastating economic consequences a license revocation would impose upon USAA on the one hand and the vague claim of risks to the state from a Texas bank not doing business in Pennsylvania on the other hand, we conclude that the district court erred by holding that state appeal and supersedeas procedures adequately protected USAA's interests.

*USAA v. Muir,* 792 F.2d at 362–63.

come very real, the statute can be more narrowly drawn so that its burden on interstate commerce is lessened and its objectives are still effectuated. In keeping with the standard set forth in *Pike* and followed in *Edgar*, we find that in the case before us the burden imposed on commerce by the instant Pennsylvania law is clearly excessive in relation to the putative local benefits.

The Commissioner argues that we should follow as controlling precedent the case of *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). In *Exxon*, the plaintiffs challenged, on Commerce Clause grounds, a Maryland statute prohibiting producers and refiners of petroleum products from operating retail service stations within the state. The Supreme Court held that the Maryland statute was constitutional; the statute did not discriminate against interstate goods, favor local producers or refiners, or impermissibly burden interstate commerce. One of the plaintiff's arguments was that the divestiture requirements would cause several refiners to stop selling in Maryland and deprive consumers of their services. In response, the Court stated that these factors did not warrant a finding of an impermissible burden. The Court further stated that "[i]t may be true that the consuming public will be injured by the loss of ... stations operated by the independent refiners, but again that argument relates to the wisdom of the statute, not to its burden on commerce." *Id.* at 128, 98 S.Ct. at 2215.

We carefully considered the instant case in light of the holding in *Exxon*. Indeed, there is one obvious similarity. A corporation which has been conducting business within a state is required by a state statute to cease doing business in that state. Similar to the independent refiners in the *Exxon* case, USAA, if Section 641(b) were enforced against it, would be forced to leave Pennsylvania due to a state law. Because of this basic similarity between *Exxon* and the instant case, it would be simple to end the comparison of the cases at that point and declare Section 641(b) constitutional. However, we find that unlike the Pennsylvania statute in our case, the Maryland statute in the *Exxon* case did not reach beyond the borders of the state. It simply and unequivocally banned refiners and producers from operating retail stations. It did not have the practical effect of indirectly regulating the refiners' ownership of other entities outside the state.

■ In contrast, Section 641(b), in practical effect, reaches beyond Pennsylvania's borders to interfere with the ownership of a federal savings and loan bank in Texas which was properly approved by and operates under the regulations of the appropriate federal agencies. In this sense, the instant case is more nearly like the situation presented in *Edgar* wherein the Illinois statute had the practical effect of reaching beyond the state borders to affect indirectly commerce in other states.[12]

Finding that the burdens imposed on commerce by Section 641(b) of the Pennsylvania Insurance Department Act are clearly excessive in relation to the putative local benefits and that Section 641(b) could be more narrowly drawn and still serve the

---

12. The Commissioner also brought to our attention the cases of *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), and *Norfolk Southern Corporation v. Oberly*, 822 F.2d 388 (3d Cir.1987). We distinguish both cases from our case on the basis that they address environmental regulations, as opposed to economic regulations. For example, in *Huron* the Court stated:

In determining whether the state has imposed an undue burden on interstate commerce, it must be borne in mind that the Constitution when 'conferring upon Congress the regulation of commerce, ... never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country.'

*Huron*, 362 U.S. at 443-44, 80 S.Ct. at 816. Although the same balancing test is applicable in situations involving environmental regulations and economic regulations, it appears to us that more deference is typically given to a local or state environmental regulation.

purposes for which the statute was enacted, we find Section 641(b) as applied here unconstitutional under the Commerce Clause of the United States Constitution.[13] We shall, therefore, grant USAA's motion for summary judgment and, accordingly, enter judgment in favor of USAA and against the Insurance Commissioner.

An appropriate order will be entered.

## ORDER

AND NOW, this 23rd day of December, 1987, in accordance with the accompanying Memorandum, IT IS HEREBY ORDERED that the defendant's motion for summary judgment on abstention grounds and the plaintiffs' motion for summary judgment on pre-emption grounds are denied.

IT IS FURTHER ORDERED that the plaintiffs' motion for summary judgment on Commerce Clause grounds is granted. Section 641(b) of the Pennsylvania Insurance Act of 1921, 40 Pa.S. § 281, as applied to the plaintiffs, is unconstitutional under the Commerce Clause of the United States Constitution. Accordingly, the defendant is permanently enjoined from taking further action to revoke the plaintiffs' insurance licenses.

IT IS FURTHER ORDERED that the Clerk of Court is directed to enter judgment in favor of the plaintiffs and against the defendant and to close the file in this case.

---

**13.** We also find that there is no genuine issue as to any material facts. Fed.R.Civ.P. 56(c).