STANDARD MONUMENT COMPANY, Inc., a Corporation, (Plaintiff) Appellant,

v.

MOUNT HOPE CEMETERY AND MAUSO-LEUM COMPANY, a Corporation, W. Donald Dubail, Reeves S. Dell, and John M. Litzinger, (Defendants) Respondents.

No. 31260.

St. Louis Court of Appeals.

Missouri.

July 16, 1963.

Rehearing Denied Sept. 4, 1963.

Robert O. Hetlage, Richard A. Hetlage, St. Louis, for appellant.

Charles R. Judge, Dubail, Judge & Kilker, St. Louis, for respondents.

WOLFE, Judge.

The plaintiff corporation, which deals in burial monuments and grave markers, brought this suit seeking to invalidate certain regulations imposed by the defendant cemetery company. The regulations required that burial markers be installed by the cemetery at a price based upon the size of the marker. The petition was in three counts. Count 1 charged a violation of the Missouri anti-trust statute. Count 2 alleged that the regulation was beyond the power of the defendant to adopt and the plaintiff was illegally prevented from completing contracts with those owning burial lots in the cemetery. Count 3 alleged a conspiracy among the individual officers and directors of the defendant company. The defendant

counterclaimed for a sum owing for the installation of a burial marker, the installation having been made at the plaintiff's request. The court sustained a motion to dismiss Count 1 and Count 3 of the plaintiff's petition, and there was a finding for the defendant on Count 2, and also for the defendant on its counterclaim. The plaintiff prosecutes this appeal.

The following are the facts of the case as they appear from the pleadings and the evidence. The defendant Mount Hope Cemetery and Mausoleum Company is a corporation organized for business purposes. It owns and operates the Mount Hope Cemetery. It and its predecessor in title sold burial lots to numerous purchasers, specifying that the lots sold were for burial purposes only and subject to the rules and regulations of Mount Hope Cemetery "which have been and may hereafter from time to time be adopted."

In 1946 a portion of Mount Hope Cemetery was set aside to be known as "Memorial Gardens". In that section no monuments were allowed. Grave markers were permitted, and the regulations as to them had been changed from time to time. The regulation in force at the time here involved was adopted in March, 1959, and was as follows:

### "MEMORIAL GARDENS

"*Only bronze markers* of good quality and craftmanship set flush with the turf and mounted on a granite base are permitted. Please specify manufacturer, design, size, and catalog number. The following charges include the granite base and installation:

"Single markers (maximum size 340 sq. in.)—26¢ per sq. in.

"Companion markers (minimum size 400 sq. in.)—28¢ per sq. in."

The defendant cemetery company retails bronze markers of the kind described in the regulation. It allows no monument dealer to set any bronze marker. The cemetery company supplies a granite base to which the bronze marker is attached and sets all of the markers in the Memorial Gardens section of the cemetery, whether it sells the bronze marker or the marker is sold to the lot owner by some other dealer.

With full knowledge of these regulations, plaintiff agreed with a Mrs. Ripper to erect a grave marker on a lot belonging to her located in the Memorial Gardens section of the Mount Hope Cemetery. The remains of her husband were buried there, and the marker was to be a "double bronze marker" with both her husband's name and her name upon it.

The marker was 48 inches by 16 inches, and it was required that it be set upon a granite base, which would cost approximately $55.00. The price of the base and the setting, according to the cemetery regulations, totaled $215.04. The purchaser had first obtained a price from the Mount Hope Cemetery and had been told that a marker 44 inches by 13 inches would cost $350.00. The plaintiff company knew the price offered by the cemetery and closed a contract with Mrs. Ripper for a larger marker and at a price $10.00 lower, in order "to bring a test case". The marker was made as ordered from the manufacturer by the plaintiff monument company and delivered to it. It was then taken by the president of the monument company to the Mount Hope Cemetery. He asked that the Standard Monument Company be permitted to install the marker, but such permission was denied. He then offered the defendant cemetery company $100, which was refused. According to the petition, after repeated demands, the defendant company did install the Ripper marker and billed the plaintiff company for $215.04, which was the known, established price charged by the defendant cemetery company. The plaintiff president testified that he told the Mount Hope superintendent that he would not pay $215.04, and the plaintiff has never paid it.

There was testimony that a smaller marker was sold by the Standard Monument

Company to another lot owner. The contract in that sale was for $185.00. The cemetery company informed the monument company that the installation price on this marker would be $87.36. The marker was never delivered to the cemetery. The president of the monument company testified that if he paid the $87.36 charge, he would have had a profit of $40.00 on the sale of the second marker. He stated that he would lose $46.00 on the Ripper contract if he paid the cemetery charge of $215.04.

The plaintiff monument company called as a witness a man who testified that he and his partner installed monuments and markers. They had been engaged in the business since 1934. They set foundations mostly in small cemeteries that had no maintenance crews. He said that six cemeteries in the St. Louis area set the grave markers by their own crews. He testified that he only charged $12.00 to dig a hole and set a marker.

The cemetery in question was started about 1912. There was a foreclosure, in which the present defendant cemetery corporation took title in 1939. In 1943 a perpetual care fund was created by setting aside, for that purpose, a part of the revenue from the sale of lots. The resetting of markers, care of monuments, and other services came out of the general revenue of the defendant corporation, and not from the perpetual care fund. The cemetery was being operated by the defendant at a substantial loss up to 1955. Since the 1959 regulation there has been a profit.

The Vice-President of the Mount Hope Cemetery and Mausoleum Company testified. He was in charge of the sale of markers and monuments. He had submitted a bid of $350.00 on the Ripper marker. A marker of the size that he bid on would have carried an installation charge of $160.00 under the regulations then in force. The marker itself would have cost between $109.00 and $117.00. A profit would consequently have been made on the sale of the marker itself.

The witness testified that when a marker is sent to the cemetery for installation, it is first checked to see that it conforms to the regulations of the cemetery. It is checked for correctness of spelling, uniformity, and quality. It is necessary to check the bolts, nuts, and washers that come with the marker. If the proper bolts are not there, then it is necessary to buy them and to thread the bolts and the nuts. Normally, it is necessary to do this, and it involves considerable time. After this is done, the bronze marker is then taken to the maintenance shed. The marker is not of uniform thickness and the indentations on the bottom of it are filled with cement. It is then bolted to the granite base. This base is 4 inches thick and extends 2 inches in length and width beyond the marker. The base with the marker attached is then taken to the lot located by the superintendent. The place to set the marker is indicated and a hole is dug. Sand is placed in the hole, and on top of the sand gravel. This permits water to drain away form the bottom of the base. From time to time a marker has to be reset, and no charge is made for this.

In addition to the Memorial Gardens section the cemetery had a conventional section where monuments of any kind desired might be installed by the lot owner. In this there was no restriction against dealers setting monuments and grave markers. The cemetery company would prepare a foundation in that section for a memorial 4 feet by 1 foot, for a charge of $33.50. The dealer was permitted to set the memorial marker.

The statutes upon which the plaintiff Monument Company relies are Sections 416.010, 416.040, and 416.190, RSMo 1959, V.A.M.S.

Section 416.010 declares combinations in restraint of trade to be a conspiracy, and it holds guilty "any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understand-

ing with any person or persons in restraint of trade * * *."

Section 416.040 sets forth the area covered by the statute where two or more persons enter into "arrangements, contracts, agreements, combinations or understandings * * *."

Section 416.090 provides that any person injured in his business by such combination may sue and recover three-fold damages.

We are confronted with a question of whether or not there is an agreement of any kind between two or more persons within the meaning of the statute. As a general rule, the cases brought under this and kindred statutes are concerned with price fixing. Where competing companies enter into an agreement within the comprehension of the statute, it is referred to as "horizontal price fixing". When the agreement is between a manufacturer and a distributor or a wholesaler, it is referred to as "vertical price fixing". State of Missouri on information of Dalton v. Miles Laboratories, 365 Mo. 350, 282 S.W.2d 564; Temperato v. Horstman, Mo.Sup., 321 S.W.2d 657. The facts here certainly do not bring it within either of these classifications, for the cemetery is not charged with being in combination with others selling monuments and markers or with price fixing through its own factors.

Mount Hope Cemetery and Mausoleum Company is a business corporation which owns a cemetery. It is permissible under the Missouri law for a corporation to own and manage a cemetery for profit. Plymouth Securities Company v. Johnson, Mo.Sup., 335 S.W.2d 142; Powers v. Johnson, Mo.App., 306 S.W.2d 616; United Cemeteries Co. v. Strother, 332 Mo. 971, 61 S.W.2d 907, 90 A.L.R. 438. The owning company holds the legal title to the land subject to an easement or burial privilege belonging to those to whom lots have been sold. Billings v. Paine, Mo. Sup., 319 S.W.2d 653.

The use of such lots may be restricted by the owning company. United Cemeteries Co. v. Strother, supra. The owning company may sell markers for the graves to the lot owners, and it is not unreasonable for it to require that the setting of such markers should be done exclusively by the cemetery company. Sections such as Memorial Gardens of Mount Hope Cemetery require mowing and care. They also require uniformity to maintain the beauty of the section. It is therefore important that the setting be done in such a way as to accommodate the lawn mowers and that the appearance, shape, and quality of the marker and its foundation conform to the others in the cemetery. Gasser v. Crown Hill Cemetery Ass'n, 103 Colo. 175, 84 P.2d 67; Terwilliger v. Graceland Memorial Park Ass'n, 59 N.J.Super. 205, 157 A.2d 567; Daily Monument Co. v. Crown Hill Cemetery Ass'n, 114 Ohio App. 143, 176 N.E.2d 268.

Another phase of the statutes relied upon, which renders them not applicable to the situation here, is that they deal with "the importation, transportation, manufacture, purchase or sale of any product or commodity in this state * * *." The charge here complained of is for services. In Harelson v. Tyler, 281 Mo. 383, 219 S. W. 908, the court said, l. c. 913:

"The contract in question is one whereby men engaged in the same business have bound themselves to charge uniform rates for personal services, merely that and nothing more. The combination thus formed is not under the ban of the statute, for the reason that labor, whether physical, or intellectual, or a combination of the two, is not by any fair rule of construction a 'product or commodity' that is the subject of 'importation, transportation, manufacture, purchase, or sale,' within the meaning of the words as used in the statute."

The plaintiff, however, contends that this arrangement, though unilateral and for

services, is a "tying in" of the product sold, and that it cannot sell to the lot owners of Mount Hope Cemetery because of an unreasonable installation charge. We are cited to Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545, which was a prosecution under the Sherman Act. This case had to do with the selling and leasing of vast tracts of land by the Northern Pacific Railway Company. Most of the sales and leases had "preferential routing" clauses. These clauses compelled the buyer or lessor to ship over the Northern Pacific Railway all commodities produced or manufactured. The Supreme Court of the United States held this to be a violation of the Sherman Act. It was stated that the clause imposed an appreciable restraint on free competition in the tied product. The opinion, however, states, 356 U.S. 1. c. 6, 78 S.Ct. 1. c. 519:

"Of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most. As a simple example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself."

Thus it would appear that if we were to hold that the Mount Hope Cemetery restrictions were a "tying in" arrangement—which we do not—the anti-trust law would still be without application. The cemetery in question is but one of at least forty major cemeteries in the St. Louis area, under the plaintiff's own evidence. Its regulations could have no appreciable effect upon the marketing of grave markers.

Counsel for the plaintiff have diligently researched the points here under consideration. We are cited to a number of cases in other jurisictions. Some of these arise in states where the basic concept of cemetery operations differs from ours. Others arise in states which have statutory regulations which we do not have. All of these have been considered, but to cite and distinguish them would serve no purpose here.

As to the reasonableness of the charge made, it is quite apparent that it is higher than a monument setting company would charge. This would not necessarily make it unreasonable if the cost of the over-all services rendered by the cemetery drew from the revenues thus received. We are not, however, required to pass upon the reasonableness of the charge. The outside dealer merely passes the charge on to the lot owner who buys from him. If the complaint is valid, it rests with the lot owner and not with the monument dealer.

As stated, there was a judgment for $215.04 against the plaintiff on the defendant's counterclaim. The plaintiff here contends that there was no basis for an implied contract, nor was the proof sufficient to support a judgment on quantum meruit. The defendant relies upon plaintiff's allegation in its petition wherein it is stated that numerous demands were made to have the marker installed.

 The fact that the marker was installed at the plaintiff's request and that the plaintiff knew of the defendant's charge for such work would be sufficient, if it stood alone, to support a counterclaim of $215.04. A contract may be implied from the acts of the parties where they show a mutual intent to contract and their acts are in accord with the ordinary course of dealings. Roper v. Clanton, Mo.App., 258 S.W.2d 283; Muse v. E. A. Whitney & Son, 227 Mo.App. 640, 56 S.W.2d 848; Kelsall v. Riss & Co., Mo.App., 165 S.W.2d 329. The defendant offered no evidence on the counterclaim. Under the facts before us, however, it is apparent that the plaintiff left the marker with the defendant for installation and refused to pay the fixed

charge. It offered to pay $100, and this was refused. At all times prior to the installation, the plaintiff refused to pay $215.04. The defendant had but two courses open to it. One was to return the marker, and the other was to install it at the $100 price offered. Since it did install it, the only inference that we can draw from the evidence is that it chose the latter course, and the counterclaim should have been allowed in the sum of $100.

For the reasons stated, we affirm the judgment against the plaintiff and in favor of the defendants on the plaintiff's cause of action; and we reverse and remand the cause as to the counterclaim, with directions to enter a new judgment for the defendant in the sum of $100. Three-quarters of all costs shall be assessed against the appellant, and one-quarter against the respondents.

RUDDY, P. J., and ANDERSON, J., concur.