KANSAS CITY N.O. NELSON
CO., Appellant,

v.

MID–WESTERN CONSTRUCTION COM-
PANY OF MO., INC., and The Western
Casualty and Surety Company, Respon-
dents.

No. WD 41570.

Missouri Court of Appeals,
Western District.

Nov. 7, 1989.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 2, 1990.

Application to Transfer Denied
Feb. 13, 1990.

Robert O. Jester, Duane E. Butler of Ensz and Jester, Kansas City, for appellant.

Stephen B. Sutton and Mark E. Kelly of Gage & Tucker, Kansas City, for respondents.

Before MANFORD, P.J., and SHANGLER and CLARK, JJ.

MANFORD, Presiding Judge.

This is a suit for the cost of plumbing materials supplied by appellant, Kansas City N.O. Nelson Co., to a United States Department of the Army, Corps of Engineers project at the Harry S. Truman Dam and Reservoir in Missouri.

The general contractor on the project was C.L. Fairley Company (Fairley). Fairley subcontracted with respondent, Mid–Western Construction Company of Missouri, Inc. (Mid–Western), for the construction of two Public Use Areas within the Truman project. Mid–Western in turn subcontracted with Tanner–Hamilton Mechanical (Tanner–Hamilton) for construction of the plumbing portions within the Public Use Areas. Hence, Tanner–Hamilton is considered a sub-subcontractor for the project. Appellant is a wholesale plumbing supplier who contracted with Tanner–Hamilton to supply specialized plumbing fixtures which met the project's specifications.

The subcontract between Fairley and Mid-western provides "that the materials to be furnished and/or work to be done by the subcontractor are as follows: to provide all labor, materials and equipment to construct" the bid items, specifically the shower, wash house, change house, entrance station and well house buildings. Fairley agreed to pay Mid–Western $361,000 for

performance of the subcontract. The subcontract also provides in Section 8(c) that:

The Subcontractor [Mid–Western] further specifically obligates himself to the Contractor [Fairley] in the following respects, to-wit: ...

(c) To pay for all materials furnished and work and labor performed under this Subcontract and to satisfy the Contractor [Fairley] thereupon whenever demand is made and to indemnify the Contractor [Fairley] and the owner against and save them and the premises harmless from any and all claims, suits, or liens therefor, by others than the Subcontractor.

The subcontract contains an Additional Provision number 10 which requires Mid–Western to provide a performance and payment bond for the amount of the subcontract.

As a result of the Additional Provision, Mid–Western subsequently purchased from respondent, Western Casualty and Surety Company (Western Casualty), a Subcontract Labor and Material Payment Bond. The subcontract is made part of the bond by reference. Mid–Western, as the Principal, and Western Casualty, as the Surety, are bound to Fairley as the Obligee. The bond provides that if Mid–Western promptly pays all claimants for all labor and material used or reasonably required for use in the performance of the subcontract, then the obligation becomes void. The bond further provides conditions for Western Casualty's obligations; Section (1) states, in part, that a claimant is defined as one having a direct contract with the Principal [Mid–Western] for labor, material or both, used or reasonably required for use in the performance of the contract.

The contract between Mid–Western and Tanner–Hamilton requires Tanner–Hamilton to construct the shower house and wash house for a sum of $61,000. It also provides in Section III that Tanner–Hamilton agrees:

To pay for all materials, skill, labor and instrumentalities used in. (sic) or in connection with the performance of this Subcontract, when and as bills or claims therefore become due, and to save and

protect the Project, the Owner, and the Contractor from all claims and mechanics' liens on account thereof, and to furnish satisfactory evidence to the Contractor, when and if required, that he has complied with the above requirements.

The plumbing fixtures which are the subject of this action were supplied by appellant to Tanner–Hamilton between March, 1984 and August, 1985. The fixtures were not commonly available and were designed to meet the specifications of the Truman project. The fixtures were ordered, then stored in appellant's warehouse until needed for installation. Tanner–Hamilton was allowed to take delivery of the fixtures as needed without prior payment. Kent Best, President and Manager of appellant, testified that he had done business with Ray Hamilton of Tanner–Hamilton for many years. Best delivered the fixtures based on assurances that Best would receive payment for the fixtures after Tanner–Hamilton received payment for its work on the project. Hamilton told Best the project was bonded.

The project eventually developed problems in August, 1985. As a result, Mid–Western retained Mr. C.E. Anderson to supervise completion of the work. At this time, Mid–Western was financially unable to complete the work under the subcontract and funds for the completion of the project were supplied by Western Casualty. Mid–Western admitted that Anderson had authority to act on behalf of Mid–Western.

Appellant was informed in August or September, 1985 that Tanner–Hamilton would not be completing its work on the project. Tanner–Hamilton had not paid appellant for plumbing fixtures previously delivered, which were valued on the invoices at $24,236.97. However, Tanner–Hamilton is not a party to this suit. The appellant supplier chose to name as parties Mid–Western (the subcontractor) and Western Casualty (the surety).

A central issue in this suit is whether Anderson, as an agent of either or both Mid–Western and Western Casualty, ratified and assumed the obligations of Tanner–Hamilton to pay for the previously de-

livered fixtures. Best testified that Anderson telephoned him to locate the remaining plumbing fixtures designated for the project and to notify him that Maxwell–Gable Mechanical (Maxwell–Gable) was employed by Mid–Western to complete the work started by Tanner–Hamilton. Best initially voiced concern over the unpaid invoices of Tanner–Hamilton. Best's testimony was as follows:

Q. Did you talk with Mr. Anderson about your unpaid invoices totaling over some twenty-four thousand dollars?

A. I told him I had over twenty-four thousand dollars worth of invoices and that I didn't know if we were going to furnish those fixtures and that is the way it was. He said Mid–Western is a very good company. There is no problem with them. I said, well, there may not be a problem with them, but I am not being paid so there is a problem somewhere. He said it is probably with your plumbing contractor.

Well, at that point it is all surmising and then we get into I knew we were really going nowhere in that conversation and I asked where, who do I contact or who should I be getting ahold (sic) of? He said Maxwell Gable will be able to help you with this.

Best further testified as follows:

Q. What if anything did Mr. Anderson indicate to you about the unpaid invoices and their satisfaction?

A. He assured me that it was a Corp (sic) of Engineers job and that if we would get our information together and get them to the proper people that we would be paid.

Best stated that Anderson never indicated the project was bonded. Best also testified that his company would not have continued to supply materials to the project without the contact from Anderson.

With respect to any agreement to deliver fixtures following this conversation with Anderson, Best testified that he told Anderson he "would cooperate with Max-

well–Gable." However, Best also stated that at that point in time he was not going to ship any fixtures. Best also testified as follows:

Q. So as I understand it, when, after you had your conversation with Anderson, you weren't satisfied with anything he told you and you weren't going to ship anything?

A. I didn't like his attitude.

Q. Yes.

A. I am owed twenty-four thousand dollars and somebody is asking me when I am going to do something. At that point maybe I would like to ask who, when someone is going to do something.

Q. You don't know who he was and who Mid–Western was?

A. I still don't, don't know who he is.

Q. And so you didn't agree to ship any materials after your conversation with him?

A. With Anderson?

Q. Right.

A. Right.

Best testified that he first met with Bill Gable of Maxwell–Gable in October, 1985 regarding the plumbing fixtures needed to complete the project. They discussed the unpaid invoices from Tanner–Hamilton. Gable said he would give Best information on who to contact for payment. Best testified that at this point, he agreed to "move forward" with Maxwell–Gable. Thereafter, Best verified the credit references of Maxwell–Gable and began supplying the remaining fixtures.[1] When asked why he continued to supply materials to the project after the contact by Anderson, Best explained:

A. Actually, after talking with Bill Gable, I agreed to move forward. With Mr. Anderson if it had only been that contact and Bill Gable hadn't contacted me, as far as I am concerned the job would still be sitting there because my reaction and the conversation with Mr. Anderson was

---

1. Maxwell–Gable has paid appellant for all fixtures supplied directly to it for use in the project and those fixtures are not the subject of this action.

not positive. Bill Gable called and tried to smooth over evidently and I think Anderson realized that his conversation didn't go positive with me, especially in the light of my opinion of where we stood in money and Gable called me and that is when I agreed to go down and meet with him and that we could iron out that situation.

Q. And you then supplied the remaining materials?

A. Yes.

At trial, Anderson did not recall telephoning or contacting Best or the appellant company regarding plumbing fixtures needed to complete the project. Anderson believed that any such contact would have been made by Maxwell–Gable.

Anderson testified that he received calls from unpaid suppliers of the Truman project. Anderson would assure payment to suppliers if he had ordered the supplies. At times, he paid with his own money for goods he ordered, then sought reimbursement from Mid–Western. Anderson testified that he explained to suppliers that he did not have authority to give assurances that materials previously supplied to the job would be paid for. Anderson told such suppliers to contact Mid–Western. There is no testimony from Anderson with respect to any unpaid invoices for supplies delivered specifically to Tanner–Hamilton by appellant.

Best testified that on January 7, 1986, he had a second meeting with Gable and was told of Western Casualty's involvement in the project. On that date, appellant notified Western Casualty of its claim for fixtures supplied to Tanner–Hamilton. Appellant later provided a separate notice of the claim to Fairley and Mid–Western.

The secretary/treasurer of Mid–Western, Pat Engle, executed a notarized final payment affidavit stating, in part, that all material bills and other indebtedness connected with the subcontract with Fairley have been paid and all claims of whatever nature satisfied, as required by the subcontract. The affidavit was made for the purpose of receiving the final payment from Fairley for the completed project. Engle understood the affidavit to mean that Mid–Western paid all of its bills for labor and material which it supplied under the subcontract with Fairley. Engle considered the unpaid invoices for plumbing fixtures to be bills that Tanner–Hamilton contracted to pay. Engle testified that Mid–Western paid Tanner–Hamilton in full, and perhaps had overpaid Tanner–Hamilton due to the incomplete plumbing work.

Appellant's amended petition alleges four grounds for relief against Mid–Western and Western Casualty. In Count I, appellant seeks recovery based on Mid–Western's ratification and assumption, through its agent Anderson, of the materials supply contract between appellant and Tanner–Hamilton in return for appellant's cooperation in supplying the remaining fixtures required to complete the project. In Count II, appellant seeks recovery under the terms of the subcontract labor and material payment bond. In Count III, appellant seeks recovery on the grounds that Western Casualty ratified and assumed the materials supply contract between Tanner–Hamilton and appellant in exchange for appellant's continued cooperation in supplying plumbing fixtures for the completion of the project. In Count IV, appellant, as a sub-subcontractor, seeks recovery as a third party beneficiary to the subcontract between Fairley and Mid–Western.

This matter was tried to a jury. The court, however, granted a directed verdict against appellant on all counts. This appeal followed, challenging the directed verdict on two grounds. The judgment is affirmed in part and reversed in part.

In reviewing the entry of a directed verdict in favor of defendants, this court must consider the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff in order to determine whether plaintiff made a submissible case against any of the defendants under any of the theories presented in the petition. *Rustici v. Weidemeyer*, 673 S.W.2d 762, 765 (Mo. banc 1984).

In point one on appeal, appellant contends that the trial court erred in directing a verdict against it on Count IV. Count IV alleged that appellant was a third party beneficiary to the subcontract between Fairley and Mid–Western. The subcontract language between Mid–Western and Fairley obligates Mid–Western to construct the Public Use Areas, "to pay for all materials furnished and work and labor performed under the subcontract," and to provide a bond for the amount of the subcontract. Appellant argues that this contract language evidences the intent of Fairley and Mid–Western to bestow a benefit upon the third-party suppliers of materials incorporated into the Public Use Areas. Respondents, on the other hand, argue that the language of the bond precludes the finding of a third party beneficiary because the bond defines "claimant" as only material suppliers having a direct contract with Mid–Western. Appellant had no direct contract with Mid–Western.

This case will first be reviewed to determine whether the trial court erred in directing a verdict against appellant on Count IV. Appellant asserts third party beneficiary rights based upon the Fairley and Mid–Western subcontract. This portion of the review does not consider appellant's rights as a third party beneficiary to the surety contract between Mid–Western and Western Casualty. In other words, the bond is not now at issue. At issue is whether appellant as a material supplier to a sub-subcontractor is a third party beneficiary to the construction contract between the general contractor and a subcontractor.

■ Third party beneficiary is the nomenclature given to one who is not privy to a contract nor to its consideration but to whom the law gives a right to maintain a cause of action for breach of contract. *Halamicek Bros. v. R & E Asphalt Service*, 737 S.W.2d 193, 195 (Mo.App.1987). Only those third parties for whose primary benefit the contracting parties intended to make the contract may maintain an action. *Laclede Investment Corp. v. Kaiser*, 596 S.W.2d 36, 41 (Mo.App.1980). The intention of the parties is to be gleaned from the four corners of the contract, and if uncertain or ambiguous, from the circumstances surrounding its execution. *Id.* Although it is not necessary that the third party beneficiary be named in the contract, the terms of the contract must express directly and clearly an intent to benefit an identifiable person or class. *Id.*

■ Third party beneficiaries fall into three categories: donee, creditor and incidental. The first two categories may recover, the third may not. *Terre Du Lac Ass'n v. Terre Du Lac, Inc.*, 737 S.W.2d 206, 213 (Mo.App.1987). A person is a donee beneficiary if the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed nor asserted to be due from the promisee to the beneficiary. *Id.* A person is a creditor beneficiary if the performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary. *Id.* Finally, if the person is neither a donee beneficiary nor a creditor beneficiary, he is an incidental beneficiary. *Id.*

Appellant fits into the category of a donee beneficiary to the Fairley and Mid–Western subcontract. Therefore, appellant is entitled to recover against Mid–Western for the cost of plumbing materials supplied under the subcontract. The trial court erred in directing a verdict against appellant on Count IV.

The unambiguous intention of the parties may be gleaned from the four corners of the subcontract. Mid–Western's promise to Fairley obligates Mid–Western to furnish and pay for all materials used in construction of the Public Use Areas, namely the shower house, wash house, change house, entrance station, and well house buildings at the Truman project. The fact that the appellant is not individually named as a third-party beneficiary to the subcontract does not preclude recovery. The subcontract language expresses the clear intent that Mid–Western is obligated to pay the class of suppliers providing materials used in construction of the Public Use Ar-

eas. There is no dispute that the appellant company provided plumbing fixtures which were used as materials in the Public Use Areas. Furthermore, the parties to the subcontract did not exclude recovery by this class of third-party beneficiaries. The subcontract contains no language limiting the class of intended third-party beneficiaries to only those supplying materials directly to Mid–Western. By the subcontract terms, all suppliers of materials used in the performance of Mid–Western's construction of the Public Use Areas are entitled to pursue an action against Mid–Western for payment.

The testimony of Pat Engle, the secretary/treasurer of Mid–Western, does not preclude appellant's recovery on a third-party beneficiary theory. The language of the contract is unambiguous. Engle's testimony does not go towards establishing the intent of the parties at the time the contract was formed. Engle did not sign the contract. Engle merely testified to her understanding of the contract at a later time when she executed the final payment affidavit.

Mid–Western is not relieved of its obligation to pay for all materials furnished under the Fairley subcontract simply by virtue of its later subcontract with Tanner–Hamilton for construction of a portion of the Public Use Areas, namely the shower house and wash house buildings. Tanner–Hamilton contracted with Mid–Western and agreed to pay for all materials which Tanner–Hamilton used in construction of the shower house and wash house buildings. However, Mid–Western's obligations under the Fairley and Mid–Western contract are not modified or extinguished by its entering into a contract with Tanner–Hamilton for a portion of the project construction. On remand, the parties have available to them the Missouri Rules of Civil Procedure to use in bringing before the court the parties necessary to protect against multiple recoveries.

At the trial level and in making arguments to this court, counsel have presented the intent of the language in the Fairley and Mid–Western subcontract in a factual matrix centering around the governmental ownership of the land at the Truman project. The record indicates that the United States Department of the Army, Corps of Engineers own the land occupied by the Truman project. Congress has made an effort to require payment bonds on certain federal construction projects in order to protect persons supplying materials to those projects because material suppliers are generally unable to place liens upon such projects. See 40 U.S.C. § 270a, et seq. This court does not pass judgment on any cause of action under the federal statute. Rather, this court finds the unavailability of materialmen's liens to be additional evidence of the intent of Fairley and Mid–Western to make the class of material suppliers third-party beneficiaries to Mid–Western's promise to pay for all materials furnished under its subcontract to construct Public Use Areas.

For the above reasons, appellant's point one is ruled in its favor. The trial court erred in directing a verdict against appellant on Count IV and the judgment is reversed with respect to Count IV.

To enhance the thoroughness of the appellate review, this case will next be reviewed to determine whether the trial court erred in directing a verdict against appellant on Count II. In Count II, appellant sought to recover against Western Casualty under the terms of the Subcontract Labor and Material Payment Bond for the obligations of Mid–Western. At this point in the review, the bond is at issue.

This court rejects appellant's assertion that Western Casualty's obligation under the bond follows directly from the determination that appellant is a third-party beneficiary to the Fairley and Mid–Western subcontract. The subcontract and the surety bond are separate contracts between distinct parties and must be analyzed accordingly.

■ It is well settled that the right of a supplier of materials or labor to recover under a contractor's bond is one based on the contractual concept of a third-party beneficiary. *Ceco Corp. v. Plaza Point, Inc.*, 573 S.W.2d 92, 94 (Mo.App.1978). Be-

fore a supplier is found to be a third-party beneficiary to the bond, it must be shown that the surety contract was entered into with the intention to benefit such third parties. *Id. See also LaSalle Iron Works, Inc. v. Largen,* 410 S.W.2d 87 (Mo. banc 1966).

■ Appellant openly concedes that the terms of the bond at issue specifically limit the surety's obligations to only claimants defined as "one having a direct contract with Mid–Western for labor, material or both, used or reasonably required for use in the performance of the contract." This provision clearly reveals the intention of Mid–Western and Western Casualty to limit the right of claimants to sue on the bond by excluding all claimants not directly contracting with Mid–Western. Appellant presented no evidence at trial that it qualified as a "claimant" under the terms of the bond.

In light of the bond's limiting language and the effective elimination of appellant from coverage by the bond, appellant presents a collage of arguments seeking to enlarge the surety's obligations beyond the terms of the bond. In sum, appellant argues that the surety's obligation must be measured by Mid–Western's liability as defined in the subcontract with Fairley and incorporated into the bond by reference. To do otherwise, argues appellant, would ignore the reasonable expectations of the parties relying on payment under the bond, eliminate the protective purpose of the bond, and eviscerate the subcontract language requiring Mid–Western to pay for all materials furnished to the Public Use Areas.

■ These arguments are rejected. There are limits on the rights of the third-party beneficiary to recover on a surety contract. One suing on a contract made for his benefit must accept the contract as it was made by the parties. *Ceco Corp. v. Plaza Point, Inc.,* 573 S.W.2d at 94. A third-party beneficiary's rights on a surety contract are delineated by the specific terms contained in the contract, and his rights are no greater than those of the contracting party through whom he asserts

the right or claim. *Id.* The appellant must take the surety bond as written by the parties. This court will not rewrite the clearly intended language of the bond. *See Stahlhut v. Sirloin Stockade Inc.,* 568 S.W.2d 269 (Mo.App.1978); and *Bolivar Reorg. School Dist. v. American Sur. Co.,* 307 S.W.2d 405, 409 (Mo.1957). Moreover, appellant produced no evidence at trial that it relied on the terms of this particular surety bond when delivering the plumbing fixtures to Tanner–Hamilton. Indeed, Best's testimony was that he never saw the bond and delivered the plumbing fixtures based on Ray Hamilton's personal assurances of payment. Finally, adherence to the terms of the bond does not eviscerate the language in the Fairley and Mid–Western subcontract. As discussed above, Mid–Western's obligation to third-party beneficiaries of its subcontract with Fairley is analyzed independent of the surety's obligation under the bond.

Appellant is not entitled to recover on the bond and therefore, the arguments disputing the time and form of notice given by appellant under the bond need not be addressed. The trial court did not err in directing a verdict against appellant on Count II.

In point two on appeal, appellant contends that the trial court erred in directing a verdict in favor of Mid–Western and Western Casualty on the claims that either or both respondents, through their agent Anderson, ratified and assumed the contractual obligations of Tanner–Hamilton to pay appellant for plumbing fixtures previously supplied to the project. Appellant argues that the jury could have found from the evidence that Anderson was granted the authority by Mid–Western and Western Casualty to act as their agent. Appellant further argues that Anderson ratified and assumed Tanner–Hamilton's indebtedness for fixtures previously supplied to the project in consideration for appellant's agreement to supply the remaining fixtures. Appellant concludes that based upon Anderson's assurances, appellant provided the fixtures, but has not received payment.

This court has considered the evidence and all reasonable inferences therefrom in the light most favorable to the appellant. This court has determined that the trial court did not err in directing a verdict in favor of respondents on Counts I and III because appellant failed to make a submissible case.

Independent of the arguments asserted by all parties regarding the type of agency position, if any, held by Anderson and the scope of his authority, the central issue presented in this point on appeal is whether Anderson and Best ever entered into a contract or an agreement under which Mid–Western or Western Casualty would satisfy the unpaid invoices charged to Tanner–Hamilton. It should be noted that appellant asserts the dual concepts of ratification of a contract and assumption of contractual obligations of another. The concept of ratification is misapplied in this case. As it relates to agency, ratification is an express or implied adoption or confirmation, with knowledge of all material matters, by one person of an act performed in his behalf by another who at that time assumed to act as his agent, but lacked authority to do so. *See Hyken v. Travelers Ins. Co.*, 678 S.W.2d 454 (Mo.App.1984). Appellant is not understood to argue that Anderson ratified the contract of Tanner–Hamilton in the sense that somehow Anderson became a principal who would confirm contracts performed in his behalf at a time when the agent, Tanner–Hamilton, lacked authority to so act. Instead, appellant is understood to argue that Anderson, himself an agent of respondents, entered into a contractual agreement to pay appellant for fixtures previously delivered to Tanner–Hamilton.

This court need not detain itself long in determining whether the alleged agreement should be viewed as an original contract or a collateral contract by which respondents assume or guarantee to pay the debt of another. The distinction between an original contract and a collateral contract makes no difference in the initial determination of whether a contractual agreement was ever formed. All contracts require an offer and acceptance. A guaranty is a contract. *Mercantile Trust Co. v. Carp*, 648 S.W.2d 920, 923 (Mo.App.1983). The rule applicable to contracts generally, that there is no contract until an offer has been accepted, applies to contracts of guaranty. *Industrial Bank & Trust Co. v. Hesselberg*, 195 S.W.2d 470, 473 (Mo.1946).

Appellant failed to establish by substantial evidence the existence of an offer by Mid–Western or Western Casualty, through Anderson, to pay the outstanding Tanner–Hamilton invoices. The only evidence of an alleged offer was Best's testimony of a telephone conversation between himself and Anderson. This testimony has been set forth in detail above. To review, it was Best's testimony that when asked about the outstanding invoices, Anderson told Best that Maxwell–Gable would be able to help him with this. Anderson also said that the project was a Corps of Engineers job and that if appellant "would get our information together and get them to the proper people that we would be paid." This exchange fails as an offer. It is not definite. It does not mention the names of either Mid–Western or Western Casualty. Indeed, Best testified that Anderson never indicated the involvement of a bonding company in the Truman project. Best also stated at trial that he still did not know who Anderson is.

Appellant also failed to establish by substantial evidence the existence of an acceptance by Best on behalf of the appellant company. Best told Anderson he would cooperate with Maxwell–Gable. However, Best's own testimony directly reveals the lack of any acceptance or agreement between Best and Anderson during their telephone conversation. Best testified that he did not agree to ship any materials after his conversation with Anderson. Best further testified that, "with Mr. Anderson if it had only been that contact and Bill Gable hadn't contacted me, as far as I am concerned the job would still be sitting there because my reaction and the conversation with Mr. Anderson was not positive." The testimony evidences a lack of acceptance of any alleged offer from Anderson. It also evidences no action by Best in reliance on

the conversation with Anderson. From Best's testimony, it appears that he acted in reliance of his later meeting with Gable and verification of Maxwell–Gable's credit abilities.

Appellant failed to establish two essential elements of a contract between it and respondents and the trial court properly directed a verdict in favor of respondents on Counts I and III. Appellant's point two is ruled against it.

The judgment is affirmed with respect to Counts I, II, and III. The judgment is reversed with respect to Count IV and remanded for further proceedings, if any, consistent with this opinion.

All concur.