**Gary ERNST, et al., Appellants,**

v.

**FORD MOTOR COMPANY, et al., Respondents.**

**No. WD 43823.**

Missouri Court of Appeals, Western District.

July 23, 1991.

Duane J. Fox, Paul G. Schepers, Peter Griffith, Kansas City, J. Michael Dady, Joseph Thomson, and M.E. Alden, Minneapolis, Minn., for appellants.

Robert L. Driscoll, Kansas City and Mark Hinderks, Overland Park, Kan., for Ford.

J. Nick Badgerow, Overland Park, Kan., for Versatile.

Before ANTHONY P. NUGENT, Jr., Senior Judge, P.J., SHANGLER, GAITAN and FENNER, JJ.

ANTHONY P. NUGENT, Jr., Senior Judge.

Plaintiffs, former dealers of agricultural equipment and parts, appeal from the judgment of the circuit court entering summary judgment on all counts in favor of Ford Motor Company, Ford New Holland, Inc., and New Holland, Inc., (collectively referred to as "FNH"), and in favor of Versatile Farm Equipment Corporation ("VFEC") on Counts II, III, IV and VIII.

Versatile Corporation, a Canadian corporation ("Versatile"), engaged in the manufacture and sale of farm equipment. The unincorporated agricultural equipment division of Versatile manufactured Versatile branded equipment for VFEC, a Missouri corporation, for marketing through VFEC's dealers in the United States.

The plaintiffs, dealers from Missouri, Kansas, Minnesota and Wisconsin, entered into identical written dealership agreements with VFEC. Paragraph 21.3 of those agreements provided that: "This Agreement may be terminated by either party at any time after the date of its

approval, with or without cause, by not less than 90 days written notice...."

In July, 1986, in response to financial problems, Versatile shut down its Winnipeg, Manitoba, facility which manufactured Versatile branded tractors. As Versatile's financial condition deteriorated, Versatile sought a purchaser for its agricultural equipment sales.

On March 23, 1987, to facilitate the reopening of Versatile's manufacturing facilities, FNH and Versatile entered into an interim operating agreement, pursuant to which FNH provided loan guaranties to Versatile. FNH and Versatile executed an asset purchase agreement on May 21, 1987, and the purchase closed on July 10, 1987. In the asset purchase agreement, FNH expressly excluded 150 dealers from the transaction.

In connection with the asset purchase, the Canadian government agreed to lend FNH $45.5 million (Cdn.), contingent upon delivery of the asset purchase agreement to the Canadian government and upon delivery of an approval. The government granted the approval after FNH disclosed its business plan would include retention of "the existing Canadian Versatile dealer network. This plan is not intended, however, to restrict the right of FNH or the Borrower to terminate specific Versatile dealers for non-performance or other valid business reasons or objectives." (Loan Agreement, § 4.1(g)).

On May 22, 1987, VFEC sent notice to each of the corporate plaintiffs (except Garden City Farm Equipment, Inc., and Dodge City Farm Equipment, Inc., which the records did not reflect as dealers on that date), informing them that the Versatile dealership agreement would be terminated in ninety days pursuant to paragraph 21.3 of their Versatile contract.

On July 27, 1987, in a letter to "Dealers Terminated by Versatile Corporation,"

FNH informed those dealers that the asset purchase had closed and that VFEC had assigned the receivables from the dealers to FNH and that all sums owed thereunder should be paid to FNH. The letter also stated that: "On behalf of Versatile Corporation, New Holland, Inc., has agreed to make wholegoods and service parts available to meet your resale needs until the effective date of your termination. All such sales will be made on a COD basis." VFEC terminated plaintiffs effective August 22, 1987.[1]

Plaintiffs brought this action claiming breach of contract (Count I), promissory and equitable estoppel (Count VI), unjust enrichment (Count VII), recoupment (Count IV), tortious interference (Count V), violation of Kansas and Wisconsin dealership statutes (Counts II and III), and breach of contract in which plaintiffs appear as third-party beneficiaries (Count VIII). The trial court granted summary judgment to FNH on all counts, and to VFEC on Counts II, III, IV and VIII.

■ We review a summary judgment as we would any court-tried or equity proceeding. If we can sustain the judgment under any theory, we must do so. *McCready v. Southard,* 671 S.W.2d 385, 387 (Mo.App.1984). If the trial court has reached a correct result for incorrect reasons, we still must affirm. *Labor Discount Center, Inc. v. State Bank & Trust Co. of Wellston,* 526 S.W.2d 407, 429 (Mo. App.1975). We review the entire record in the light most favorable to the party against whom the trial court entered judgment. *Fisher v. Scott & Fetzer Co.,* 664 S.W.2d 662, 663 (Mo.App.1984).

■ A trial court must exercise great care in granting summary judgment, frequently referred to as "an extreme and drastic remedy." *Gal v. Bishop,* 674 S.W.2d 680, 682 (Mo.App.1984). It may

1. The question of plaintiffs' termination arose in an earlier action in the United States District Court in Kansas in which the plaintiffs sought a temporary restraining order and preliminary injunction. The court, viewing the relief requested as a mandatory injunction, denied the injunction. *Ernst v. Ford New Holland, Inc.,* No. 87–2430, slip op. (D.Kan., Oct. 21, 1987).

enter a summary judgment where the pleadings, depositions and admissions on file, together with the affidavits, if any, show that no genuine issue of material fact exists and that the law entitles the moving party to a favorable judgment. *Ronollo v. Jacobs*, 775 S.W.2d 121, 125 (Mo.1989).[2] A party opposing a proper motion for summary judgment may not rest upon mere allegations or denials, but to overcome the motion must set forth specific facts that demonstrate the existence of an outstanding genuine issue of material fact. *St. Charles County v. Dardenne Realty Co.*, 771 S.W.2d 828, 830 (Mo.1989).

### I.

As their first of seven points on appeal, plaintiffs contend that the trial court erred in granting FNH summary judgment on plaintiffs' breach of contract claim. They first argue that genuine issues of material fact exist as to whether FNH had become a party to an express or implied contract with plaintiffs.

■ Plaintiffs assert that FNH's actions in controlling and operating Versatile from the date of the interim operating agreement until the closing of the asset purchase agreement evidence a contract. They argue that under the interim operating agreement, FNH took a very active role in running Versatile. Although the interim operating agreement requires Versatile to obtain FNH's prior recommendations for various operational matters, FNH included this requirement to ensure that Versatile did not exceed funding limits imposed on Versatile. Furthermore, the interim operating agreement expressly provided that

> [n]othing herein expressed or implied is intended or shall be construed to confer upon or give to any person ... firm or entity, other than the parties hereto and their respective successors and permitted assigns, any rights or remedies under or by reason of this Interim Operating Agreement. (Interim Operating Agreement, Para. 20(e)).

FNH also expressly disclaimed liabilities arising from Versatile's operations:

> Except for the obligations expressly assumed by NH Canada hereunder, NH Canada is not hereunder assuming and shall not hereunder be responsible for any claim, lawsuit, liability, debt or obligation arising out of or related to the operation of [Versatile's] Farm Equipment Business. *Id.* Para. 15.

Plaintiffs offered no evidence to show that the interim operating agreement created an implied contract between plaintiffs and FNH.

■ Plaintiffs next argue that FNH's July 27, 1987, letter to plaintiffs established the terms for a dealership between FNH and plaintiffs. A court may infer the creation of a contract from the acts of the parties where they show a mutual intent to contract. *Standard Monument Co. v. Mount Hope Cemetery & Mausoleum Co.*, 369 S.W.2d 876, 881 (Mo.App.1963). This letter, however, does not show an intent to enter into a continuing dealership agreement. It confirms the termination of plaintiffs' dealerships and shows FNH's agreement to accommodate Versatile and the terminated dealers by supplying goods and parts to dealers until their terminations became effective. The letter provides that the terminated dealers would receive products only on a COD basis, a condition consistent with terminating rather than beginning, a dealer-manufacturer relationship.

Even when viewed in the light most favorable to plaintiffs, the record does not establish an express or implied contractual relationship between plaintiffs and FNH by virtue of the letter or the interim operating agreement. Without proof of an existing contract, FNH cannot be held liable for breach of contract.

■ Plaintiffs also argue that, as successors to Versatile, FNH became liable for VFEC's breach of contract. Generally, a corporation that purchases the assets of

another corporation does not become liable for the debts and liabilities of the corporation whose assets it purchases. *Brockmann v. O'Neill,* 565 S.W.2d 796, 798 (Mo. App.1978). This general rule of nonliability has four exceptions: (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporation; (3) where the purchasing corporation constitutes a mere continuation of the selling corporation; or (4) where the transaction fraudulently attempts to escape liability for such debts. *Id.* Plaintiffs argue that genuine issues of fact exist as to whether the first two exceptions apply.

Plaintiffs cite *Groseth Int'l, Inc. v. Tenneco, Inc.,* 410 N.W.2d 159 (S.D.1987), to illustrate the applicability of the implied assumption theory. The facts of *Groseth* clearly distinguish it from this case. In *Groseth,* the purchase agreement required the purchaser, not the seller, to negotiate terminations with the dealer. *Id.* at 170. The South Dakota Supreme Court refused to allow the purchaser to exclude dealer agreements from the assets purchased because the agreement expressly provided that the purchaser assume obligations relating to the dealers. *Id.* at 170–71. The purchaser in *Groseth* contractually assumed responsibility for the terminated dealers.

■ No such assumption occurred in the present case. Nothing in the record suggests that FNH assumed any liability for plaintiffs' dealership contracts. The purchase agreement expressly excludes from the assets purchased the agreements with the terminated dealers. *See Wallace v. Dorsey Trailers Southeast, Inc.,* 849 F.2d 341, 343 (8th Cir.1988) (holding no implied assumption of liability under Missouri law when asset purchase agreement expressly denied liability and bankruptcy court confirmed sale free and clear of all liens, claims, or other interests of all of the creditors of the seller).

■ Plaintiffs also argue that FNH fraudulently structured its purchase to escape liability for Versatile's obligations to plaintiffs and the other terminated dealers. They allege that FNH represented to the United States and Canadian governments that they would retain the existing Versatile dealers while all along FNH planned to terminate many Versatile dealers. The record does not support that allegation.

The Canadian government loan agreement clearly provided for FNH's right to terminate Versatile dealers for valid business reasons. The loan agreement provided that "this plan is not intended, however, to restrict the right of FNH or the Borrower to terminate specific Versatile dealers for non-performance or other valid business reasons or objectives[.]" (Loan Agreement, § 4.1(g)).

Likewise, the documents presented to the Department of Justice do not claim that FNH or VFEC will terminate no Versatile dealers. It merely states that product line conflict would not threaten independent Versatile dealers. Plaintiffs offered no evidence that Versatile or FNH entered into the asset purchase agreement to escape liability. Plaintiffs have not argued that FNH did not pay a fair price for the assets, and Versatile's decline in business required that it sell those assets to satisfy its creditors. Nothing in the record suggests anything other than an arms-length transaction entered into for legitimate business purposes.

Nor does the record support the application of one of the exceptions to the general rule that a corporation does not become liable for the debts and liabilities of the corporation whose assets it purchases. To hold FNH liable as successor for Versatile's breach of contract, plaintiffs would have had to show that FNH became Versatile's successor and that VFEC committed a breach of its contracts with plaintiffs. Plaintiffs argue that genuine issues of material fact exist as to whether plaintiffs' agreements with VFEC permitted termination without just cause. We need not decide that issue because the record leads us to the conclusion that FNH did not

become liable as a successor. The trial court did not grant VFEC summary judgment on plaintiffs' breach of contract claim. That matter is still at issue in the trial court pending resolution of this appeal.

## II.

As their second point on appeal, plaintiffs argue that genuine issues of material fact remain regarding their promissory and equitable estoppel claim. They maintain that FNH should be estopped from enforcing VFEC's termination clauses. Since we have already held that FNH did not become a successor to VFEC, FNH need not rely on the termination provisions. Therefore, we need not address this argument.

■■■ Plaintiffs also argue that the court should have invoked equitable estoppel against FNH to prohibit it from acting contrary to representations FNH allegedly made to the United States and Canadian governments and to Versatile that FNH would keep the dealership network intact. Plaintiffs offered no evidence that they relied on such statements or even knew of them. To raise equitable estoppel a party must show (1) an admission, statement or act of the first party inconsistent with a claim later sued upon; (2) action by the other party on the faith of such conduct; and (3) injury to that party if the first party may contradict or repudiate its original admission, statement or act. *Smith v. Christopher*, 737 S.W.2d 510, 513 (Mo.App.1987).

■■■ The law does not favor and one may not lightly invoke estoppel. *Id.* Accordingly, a court should permit invocation of estoppel with care and caution and only when all elements clearly appear. *Id.* Plaintiffs have failed to show that they acted in reliance on representations made by FNH.

## III.

For their third point on appeal, plaintiffs argue that genuine issues of material fact remain as to whether FNH unjustly enriched itself when it allegedly directed Versatile to terminate plaintiffs.

■■■ Unjust enrichment consists of the following elements: (1) a benefit conferred upon defendant by the plaintiff; (2) appreciation by defendant of the fact of such benefit; (3) acceptance and retention by the defendant of that benefit under circumstances in which retention without payment would be inequitable. *Erslon v. Vee–Jay Cement Contracting Co.*, 728 S.W.2d 711, 713 (Mo.App.1987).

■■■ Plaintiffs assert that the inequity would result because FNH directed Versatile to terminate plaintiffs, thereby acquiring plaintiffs' intangible dealership assets without compensating them. Although they fail to offer any evidence that FNH "directed" Versatile to terminate plaintiffs, in their tortious interference claim they make the same assertion and refer to an interoffice memo that lists the Versatile employees to whom FNH would not offer employment and the Versatile dealer agreements that it would not accept. By itself, this memo does not establish unjust enrichment.

## IV.

As their fourth point on appeal, plaintiffs contend that genuine issues of fact remain as to whether they recouped their dealership investments. The trial court granted summary judgment to both FNH and VFEC on plaintiffs' claim for recoupment.

■■■ The recoupment doctrine imputes into a contract a duration equal to the length of time reasonably necessary for a dealer to recoup its investment, plus a reasonable notice period before termination. *Schultz v. Onan Corp.*, 737 F.2d 339, 348 (3rd Cir.1984). Where the parties begin to perform under a franchise, exclusive agency or distributorship agreement that says nothing about duration and does not specifically deal with termination, courts will construe it as terminable at the

will of either party. Nevertheless, upon termination, the agent becomes entitled to recoupment or to compensation on a quantum meruit basis where the agent, induced by his appointment, has in good faith incurred expense and devoted time and labor in the matter of the agency without having had a sufficient opportunity to recoup such expenditures from the undertaking. *Lockewill, Inc. v. United States Shoe Corp.*, 547 F.2d 1024, 1028–29 (8th Cir. 1976) *cert. denied*, 431 U.S. 956, 97 S.Ct. 2678, 53 L.Ed.2d 272 (1977) (applying Missouri law).

■ The right of recoupment applies only to terminable-at-will agreements. *Ag–Chem Equip. Co., Inc. v. Hahn, Inc.*, 480 F.2d 482, 487 (8th Cir.1973) (applying Minnesota law). Therefore, plaintiffs cannot assert a recoupment claim against FNH because they did not have an express or implied dealership agreement with FNH. But plaintiffs may have a claim for recoupment against VFEC, if the court finds that they had entered into terminable-at-will dealership agreements with VFEC. In their breach of contract claim against VFEC plaintiffs argue that the parties modified the agreement and, therefore, could only terminate it for good cause. This question still remains at issue before the trial court pending this appeal. If the court finds the agreement not terminable at will, the recoupment doctrine will not apply. As noted above, an agreement terminable at will must exist before the doctrine applies.

Although *Lockewill*, held that the recoupment doctrine applied where the agreement says nothing about termination, the court noted that the problem may arise in several situations, including a situation where the contract fixes no definite period of duration but specifies that one or both parties may cancel at will, or upon notice, or for designated cause, or for dissatisfaction. *Lockewill*, 547 F.2d at 1028. Also, the court in *Schultz*, observed that the at-will nature of the agreement itself—leaving the franchisee unprotected in the event

of a sudden termination without just cause—gives rise to the recoupment doctrine, whether or not the contract expresses or implies its at-will term. *Schultz*, 737 F.2d at 347 (provision allowing termination for any reason at any time upon sixty days notice rendered the agreement an at-will contract within the meaning of the recoupment doctrine). Therefore, the recoupment doctrine would apply to the dealership agreements in issue if the court finds them terminable at will, regardless of the fact that the contracts contained an express term making them terminable with or without cause.

■ If the court finds the agreements terminable at will, VFEC should have afforded the plaintiffs a length of time reasonably necessary to recoup their investment plus a reasonable notice period prior to termination. "Reasonable" varies with the circumstances of each case, *Ag–Chem*, 480 F.2d at 486, and presents a question of fact for the jury. *Schultz*, 737 F.2d at 350. Therefore, the court should have denied the motion for summary judgment on plaintiffs' claim against VFEC for recoupment.

## V.

As their fifth point on appeal, plaintiffs contend that genuine issues of material fact exist as to whether FNH's conduct in allegedly directing VFEC to terminate plaintiffs' dealerships tortiously interfered with plaintiffs' current contractual relations and prospective economic advantage.

■ Under Missouri law, a party alleging tortious interference must prove each of the following: (1) existence of a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct. *Community Title v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo.1990).

■ A plaintiff has the burden of producing substantial evidence to establish

the absence of justification. *Id.* A defendant who has a legitimate economic interest in the contract or expectancy, may with propriety interfere in that defendant's own self-interest. *Id.* One who has a present existing economic interest, such as a prior contract with or a financial interest in the affairs of the person persuaded not to enter a contract, also has a privilege to interfere with another's business expectancy to protect one's own economic interest. *Id.* "No liability arises for interfering with a contract or business expectancy if the action complained of was an act which the defendant had a definite legal right to do without any qualification." *Id.*

█ For purposes of intentional interference with contractual relations or business expectancy, "improper means" refers to independently wrongful means, notwithstanding injury caused by the interference. *Id.* at 373. The court in *Community Title,* noted that the means used by the defendant did not involve misrepresentation of fact, threats, violence, defamation, trespass, restraint of trade, or any other wrongful act recognized by statute or the common law. *Id.*

In *Mitchell Machinery, Inc. v. Ford New Holland, Inc.,* 918 F.2d 1366 (8th Cir.1990), the Eighth Circuit affirmed the granting of summary judgment for defendants on tortious interference claims identical to those presented in this case. The court held at 1371 that

> [e]ven when viewed in the light most favorable to the appellants, the facts do not demonstrate that any interference with the appellants' business relationship with Versatile was anything other than an incidental result of the bona fide purchase agreement between Ford New Holland and Versatile. It would be unsound to hold that a purchasing company's failure to acquire every dealership contract results in a cognizable claim of tortious interference with the dealers' business relationships.

█ Plaintiffs state that FNH intentionally interfered by directing VFEC to terminate plaintiffs' dealerships. As support for this contention, plaintiffs refer to FNH's May 18, 1987, interoffice memorandum that lists the Versatile employees whom it would not retain as employees and the assignment of dealer agreements that it would not accept. Nothing in the record suggests that FNH did anything more than indicate which of the dealer agreements it would not agree to accept and purchase.

Plaintiffs also refer to statements made to the United States and Canadian governments in attempting to show "wrongful" conduct by FNH. Plaintiffs then cite an interoffice memo that sets forth suggested responses to questions from the Manitoba Provincial government. None of the evidence suggests that FNH actually made those statements to the Canadian government or to the United States Department of Justice.

### VI.

█ Plaintiffs argue, as their sixth point on appeal, that additional genuine issues of material fact remain as to whether FNH and VFEC violated Kansas and Wisconsin dealership statutes. They argue that FNH became subject to the provisions of the Kansas and Wisconsin Acts by stepping into Versatile's shoes and assuming control of Versatile both before and after they purchased Versatile. They also argue that by expressly agreeing to supply wholegoods and parts to plaintiffs FNH effectively entered into dealership agreements with plaintiffs. As discussed above, nothing in the record suggests that plaintiffs had an express or implied contract with FNH. Therefore, the dealership statutes, even if otherwise applicable, cannot give rise to a claim by plaintiffs against FNH.

The Wisconsin Act defines a "dealership" as

> a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a

trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise. (Wis.Stat. § 135.02(2).)

The Kansas Act defines a "dealership agreement" as

an oral or written agreement of definite or indefinite duration between a farm equipment manufacturer and a farm equipment dealer which provides for the rights and obligations of the parties with respect to the purchase or sale of farm equipment. (Kan.Stat.Ann. 16–1202(d).)

Plaintiffs do not have dealership agreements with FNH within the meaning of either the Wisconsin or the Kansas act.

Plaintiffs also argue that the trial court erred in granting summary judgment in favor of VFEC on plaintiffs' claims for violations of the Kansas and Wisconsin acts. VFEC argues that under paragraph 27.1 of the dealership agreements the parties agreed to have Missouri law govern their construction and enforcement. Plaintiffs argue that the contractual choice of law provision does not render the Kansas and Wisconsin acts inapplicable because the acts expressly prohibit contractual limitations of the rights granted to dealers thereunder.

■ A fundamental principle of conflicts is that a forum state will always apply forum procedure, but it will choose the applicable substantive law according to its own conflicts of law doctrines. *Central States, S.E. & S.W. Areas Pension Fund v. AALCO Express Co.*, 592 F.Supp. 664, 666 (E.D.Mo.1984). Missouri follows the Restatement (Second) of Conflicts of Law (1971) in determining contract actions. *Electrical & Magneto Service Co., Inc. v. AMBAC Int'l Corp.*, 745 F.Supp. 1501, 1050 (W.D.Mo.1990). Restatement § 187(1) gives effect to the contractual choice of law "if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Therefore, we must determine whether the parties could have determined the issue of termination of the contract by explicit agreement.

■ The court in *AMBAC Int'l* held that the question of what notice a party will give prior to termination, unlike capacity and illegality, is an issue that the parties can determine by explicit agreement. *AMBAC Int'l*, 745 F.Supp. at 1505. "Whether the parties could have determined a particular issue by explicit agreement directed to that issue is a question to be determined by the local law of the state selected by application of § 188." Restatement (Second) of Conflicts, Comment c to § 187.

Therefore, if the local law of the state selected by application of § 188 regulates the termination and notice prior to termination *and* provides that these provisions cannot be waived, the parties could not agree to the terms covered by the statute. In *AMBAC Int'l*, the court noted that if Missouri law had prohibited waiver of the ninety day notice of termination requirement, the parties could not have agreed to the choice of law provision. *AMBAC Int'l*, 745 F.Supp. at 1505. Since the Missouri statutes did not contain an anti-waiver provision, however, the court upheld the parties' choice of which state's law would provide guidance on the issue of what notice to require prior to termination. *Id.* at 1506.

The Wisconsin and Kansas acts contain anti-waiver provisions. *See* Wis.Stat. § 135.025(3) (1984); Kan.Stat.Ann. § 16–1206. Wisconsin or Kansas law would preclude an agreement between the parties concerning termination of the dealer agreements at issue, while Missouri law would not. The local law of the state selected by application of § 188 will determine the question. Under the "contacts analysis" of § 188(2), Missouri has the most significant relationship to the transaction. The record and the briefs of the parties show Missouri as the state of incorporation of VFEC, the place of VFEC's headquarters, the place of

contracting, and the place of at least half of the performance under the contract. Furthermore, plaintiffs have urged this court and the court below to apply Missouri law to determine issues concerning termination of the dealership agreements. Therefore, we will uphold the parties' choice of Missouri law to determine issues relating to termination of the dealership agreements. The Kansas and Wisconsin acts do not apply.

## VII.

As their seventh point on appeal, plaintiffs argue that genuine issues of material fact also remain as to whether they can recover from FNH as third-party beneficiaries of FNH's agreement with the Canadian government. They contend that the loan agreement assumed as a premise that FNH would follow their business plan, which called for the continuation of the Versatile dealer network. They claim that FNH committed a breach of this agreement when, while in control of VFEC, it terminated plaintiffs and 137 other Versatile dealers.

Third party beneficiaries include those to whom the law gives a right to maintain a cause of action for breach of contract even though they never became privy to a contract nor to its consideration. *Kansas City N.O. Nelson Co. v. Mid–Western Constr. Co. of Missouri, Inc.*, 782 S.W.2d 672, 677 (Mo.App.1989). Only those third parties for whose primary benefit the contracting parties intended to make the contract may maintain an action. *Id.* Although the contract need not name the third party beneficiary, the terms of the contract must directly and clearly express an intent to benefit an identifiable person or class. *Id.*

Plaintiffs can point to no language or provision of the loan agreement that expresses an intent to benefit them or any American dealers. At § 4.1(g), the loan agreement specifically refers to FNH's business plan "to maintain the existing *Ca-*

*nadian* Versatile dealer network," then goes on to state that "this plan is not intended, however, to restrict the right of FNH or the Borrower to terminate specific Versatile dealers for non-performance or *other valid business reasons or objectives*" (emphasis added). Advances under the loan agreement also depended upon delivery of the asset purchase agreement to the Canadian government so that at the time the Canadian government made its loan it knew that FNH did not intend to acquire plaintiffs' dealership agreements as part of the transaction.

## CONCLUSION

Plaintiffs have failed to raise a genuine issue of material fact regarding their status as third party beneficiaries of the Canadian loan agreement. Furthermore, even if they established an issue regarding their third party beneficiary status, nothing in the record supports their allegations of a breach of the loan agreement.

Accordingly, we affirm the summary judgment entered in favor of FNH on all counts and the summary judgment entered in favor of VFEC as to Counts II, III and VIII. We reverse the summary judgment entered on Count IV and remand that count to the trial court for trial.

All concur.